**ORAL ARGUMENT HAS NOT BEEN SET**

Nos. 12-5355 & 12-5358

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

SELECT SPECIALTY HOSPITAL – BLOOMINGTON, INC., ET AL.,
*Plaintiffs-Appellants*,

v.

KATHLEEN SEBELIUS, SECRETARY, UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
*Defendant-Appellee.*

---

SELECT SPECIALTY HOSPITAL – AUGUSTA, INC., ET AL.,
*Plaintiffs-Appellants*,

v.

KATHLEEN SEBELIUS, SECRETARY, UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
*Defendant-Appellee.*

---

On Appeal From The United States District Court For The District of Columbia
(Hon. Richard J. Leon, J.), Nos. 1:09-cv-2008 and 1:09-cv-2362

---

## INITIAL BRIEF OF THE APPELLANTS

Andrew C. Bernasconi          David J. Bird
Daniel Z. Herbst              Donna M. Doblick
REED SMITH LLP                REED SMITH LLP
1301 K Street, NW             225 Fifth Avenue
Suite 1100 – East Tower       Pittsburgh, PA 15222
Washington, DC 20005          Tel: 412.288.3131
Tel:  202.414.9200            Fax: 412.288.3063
Fax: 202.414.9299             dbird@reedsmith.com
abernasconi@reedsmith.com     ddoblick@reedsmith.com
dherbst@reedsmith.com

*Counsel for Appellants In Nos. 12-5355 & 12-5358*

## CERTIFICATE AS TO PARTIES, RULINGS,
## AND RELATED CASES FOR NOS. 12-5355 & 12-5358

Pursuant to Circuit Rules 28(a)(1) and 26.1, Plaintiffs-Appellants in Nos.

12-5355 and 12-5358 certify as follows:

### (A)    Parties and Amici.

The Plaintiffs-Appellants in No. 12-5355 are Select Specialty Hospital -

Bloomington, Inc., Select Specialty Hospital - Charleston, Inc., Select Specialty

Hospital - Jackson, Inc., Select Specialty Hospital - Northwest Detroit, Inc., Select

Specialty Hospital - Saginaw, Inc., Select Specialty Hospital - South Dallas, Inc.,

and Victoria Healthcare, Inc.

The Plaintiffs-Appellants in No. 12-5358 are Select Specialty Hospital -

Augusta, Inc.; Select Specialty Hospital - Baton Rouge, Inc.; Select Specialty

Hospital - Danville, Inc.; Select Specialty Hospital - Durham, Inc.; Select Specialty

Hospital - Grosse Pointe, Inc.; Select Specialty Hospital - Honolulu, Inc.; Select

Specialty Hospital - Kalamazoo, Inc.; Select Specialty Hospital - Lexington, Inc.;

Select Specialty Hospital - Longview, Inc.; Select Specialty Hospital -

McKeesport, Inc.; Select Specialty Hospital - Midland, Inc.; Select Specialty

Hospital - Northeast New Jersey, Inc.; Select Specialty Hospital - Orlando, Inc.;

Select Specialty Hospital - Panama City, Inc.; Select Specialty Hospital - Pine

Bluff, Inc.; Select Specialty Hospital - Pittsburgh/UPMC, Inc.; Select Specialty

Hospital - Savannah, Inc.; Select Specialty Hospital - Western Missouri, Inc.;

Select Specialty Hospital - Winston-Salem, Inc.

The Defendant-Appellee in both cases is Kathleen Sebelius, in her official

capacity as Secretary of the United States Department of Health and Human

Services.

No party has intervened or appeared and participated as an amicus curiae in

the case.

**(B)    Rulings Under Review.**

These consolidated appeals arise from the final decision the district court

entered on September 20, 2012, (JA_____ (*Bloomington* DE 48); JA___ (*Augusta*

DE 53)) and all interlocutory orders made final thereby.  The rulings under review

include:  (1) the district court's March 31, 2011, memorandum opinion and order

denying Appellants' motion for summary judgment and granting in part Appellee's

cross-motion for summary judgment (JA_____ (*Bloomington* DE 24, 25);

JA____(*Augusta* DE 26)); and (2) its September 20, 2012, memorandum opinion

and order denying Appellants' supplemental motion for summary judgment and

granting Appellee's supplemental cross-motion motion for summary judgment.

JA____(*Bloomington* DE 48); JA____(*Augusta* DE 53).

**(C)    Related Cases.**

These cases previously were before this Court as *Select Specialty Hospital - Bloomington, Inc. v. Sebelius*, No. 11-5131 (mandate issued November 22, 2011), and *Select Specialty Hospital - Augusta, Inc. v. Sebelius*, No. 11-5129 (mandate issued November 15, 2011).

Cases 12-5355 and 12-5358 involve substantially the same issues brought by two groups of hospitals that have the same corporate parent.  This Court consolidated the appeals on December 10, 2012.  Appellants are not aware of any other related cases.

March 28, 2013                                         Respectfully submitted,

                                                              */s/ David J. Bird*
                                                              _____


Andrew C. Bernasconi                      David J. Bird
Daniel Z. Herbst                               Donna M. Doblick
REED SMITH LLP                            REED SMITH LLP
1301 K Street, NW                            225 Fifth Avenue
Suite 1100 – East Tower                    Pittsburgh, PA 15222
Washington, DC 20005                     Tel: 412.288.3131
Tel:  202.414.9200                            Fax: 412.288.3063
Fax: 202.414.9299                             dbird@reedsmith.com
abernasconi@reedsmith.com           ddoblick@reedsmith.com
dherbst@reedsmith.com

*Counsel for Appellants In Nos. 12-5355 & 12-5358*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ix

GLOSSARY OF ABBREVIATIONS ...............................................xv

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT ..................................................3

STATEMENT OF THE ISSUES.......................................................4

PERTINENT STATUTES AND REGULATIONS...............................4

STATEMENT OF THE CASE...........................................................5

I.      The Statutory And Regulatory Background ....................................5

        A.      Under The Medicare Statute, "Hospitals" And Other
                "Providers Of Services" Enter Into Agreements With The
                Secretary To Provide Health Care Services To Eligible
                Medicare Beneficiaries...........................................................5

        B.      The Medicare Program Reimburses Hospitals For Their
                Operating Costs And Capital-Related Costs Associated
                With Providing Inpatient Hospital Services, According
                To Payment Methodologies Mandated By Congress And
                Implemented By The Secretary..............................................7

        C.      "New Hospitals" Are Exempt From Medicare's
                Prospective Payment System With Respect To The
                Reimbursement Of Their Capital-Related Costs. ................9

        D.      Medicare's Capital-Cost Reimbursement Regulations
                Always Have Defined A "New Hospital" As A
                "Hospital" That Has Operated For Less Than Two Years.................11

II.  Factual Background ......................................................................14

    A.  None Of The Appellant Hospitals Operates Before The
       Cost Reporting Periods At Issue; Each Goes Through A
       Capital-Intensive Start-Up Process Before The Cost
       Reporting Periods In Order To Become An Operating
       Hospital. ...........................................................................144

       1.  Each Hospital Picks A Site From Which To
          Operate And Acquires, Via Arm's-Length Lease
          Agreements With Unaffiliated Entities, The Rights
          To Occupy The Site. ................................................15

       2.  Each Hospital Plans The Development Of, Then
          Develops, Its Chosen Site Of Operations. ................16

       3.  Each Hospital Obtains New Licenses,
          Accreditations, And Certifications Necessary To
          Operate As A Hospital And Begins Operations As
          A Medicare-Certified Hospital. ................................18

       4.  Two Of The Hospitals Operate On Sites Where No
          Other Hospital Operates..........................................20

       5.  The Other Hospitals Operate In Buildings Or On
          Campuses Where Other, Unaffiliated Hospitals
          Also Operate. ..........................................................21

    B.  A Medicare Fiscal Intermediary Denies The Hospitals'
       Requests For Reimbursement Of Their Capital-Related
       Costs At The "New Hospital" Rate....................................22

C.    In Sharply Split Decisions, The Provider Reimbursement Review Board Affirms The Intermediary's Decisions. ......................24

    1.    The Majority Rules, Erroneously, That The Definition Of A "New Hospital" In The Regulation Is Ambiguous In Its Use Of The Term "Hospital" And Should Be Construed To Exclude An Institution That Has Operated For Less Than Two Years If That Institution Leases A Site Formerly Used By Another, Unrelated Hospital. ....................26

    2.    Two Board Members Dissent, Recognizing, Correctly, That The Definition Of A "New Hospital" Is Unambiguous And That Each Hospital Undisputedly Is A "Hospital" That Operated For Less Than Two Years During The Cost Reporting Periods At Issue. ..............................29

D.    After The Secretary Declines To Review The Board's Decisions, The Hospitals Sue In District Court. ..................30

SUMMARY OF ARGUMENT ................................................33

ARGUMENT ...........................................................35

I.    The Standard And Scope Of Review...............................35

II.    The Board's Decisions Are Arbitrary, Capricious, Unreasonable, And Contrary To Law. ..........................37

A.    The Definition Of A "New Hospital" In 42 C.F.R. § 412.300(b) Is Not Ambiguous..........................38

    1.    Congress Established The Meaning Of "Hospital" In The Medicare Statute.........................................38

2. When The Term "Hospital" Is Given The Meaning Established By Congress, It Is Clear That Appellants Are "New Hospitals" Entitled To Reimbursement Of 85% Of Their Actual Capital-Related Costs For Cost Reporting Periods Beginning On Or After October 1, 2002. .................................41

B. Even If The Definition Of A "New Hospital" Were Ambiguous In Its Use Of The Term "Hospital," The Board's Construction Of "Hospital" Is Plainly Erroneous And Inconsistent With The Statutory And Regulatory Scheme. .................................................................43

1. The Board's Decisions Were Not Informed By The Medicare Statute's Definition Of A "Hospital."......................44

2. The Board's Construction Of The Term "Hospital" Is Not Consistent With The Use Of The Term Throughout 42 C.F.R. § 412.300(b). ........................................45

3. The Board's Idiosyncratic Construction Of The Term "Hospital" Also Is Irreconcilable With The Secretary's Use Of The Terms "Hospital" And "New Hospital" In Other Regulations, Including Companion Regulations..........................................................48

4. The Board's Reliance On The Purported Purpose Of The "New Hospital" Exemption Also Was Arbitrary And Capricious. .......................................................50

5. The Board's Decisions Produce Inefficient Results, Purport To Advance A Policy Goal Not Mandated By Congress Or The Secretary, And Improperly Deny "New Hospital" Status To All HIH Providers. .................................................................55

III. Even If The Board's Construction Of The Regulation Could Be Credited, Reversal Nevertheless Is Compelled Because The Board's Rulings Are Not Supported By Substantial Evidence. ....................57

CONCLUSION ........................................................................................59

ADDENDUM

42 U.S.C. § 1395x(e) – Hospital ...........................................................ADD1

42 U.S.C. § 1395x(u) – Provider of services...........................................ADD4

42 U.S.C. § 1395 x(ccc) – Long-term care hospital..............................ADD5

42 C.F.R. § 412.300 – Scope of subpart and definition ........................ADD6

42 C.F.R. § 412.304 – Implementation of the capital
prospective payment system...................................................................ADD6

42 C.F.R. § 412.324 – General description ...........................................ADD8

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[1]

**Page**

## Cases

*Ashtabula County Med. Center v. Thompson*,
  352 F.3d 1090 (6th Cir. 2003) .................................................................. 39, 41

*Ashtabula County Med. Center v. Thompson*,
  191 F.Supp.2d 884 (N.D. Ohio), *aff'd*, 352 F.3d 1090 (6th Cir. 2003) ..............45

Atlantic Cleaners & Dyers, Inc. v. United States,
  286 U.S. 427 (1932) ...........................................................................39

Barrick Goldstrike Mines, Inc. v. Whitman,
  260 F.Supp.2d 33 (D.D.C. 2003).............................................................53

Biloxi Reg'l Med. Ctr. v. Bowen,
  835 F.2d 345 (D.C. Cir. 1987)................................................................37

Braniff Airways, Inc. v. C. A. B.,
  379 F.2d 453 (D.C. Cir. 1967)............................................................ 57, 58

Burlington Truck Lines, Inc. v. United States,
  371 U.S. 156 (1962) ...........................................................................37

Chamber of Commerce of the United States v. Securities Exch. Comm'n,
  412 F.3d 133 (D.C. Cir. 2005).................................................................37

*Christensen v. Harris County*,
  529 U.S. 576 (2000) ........................................................................ 35, 36

County of Los Angeles v. Shalala,
  192 F.3d 1005 (D.C. Cir. 1999).................................................................8

---

[1]     Authorities upon which the Appellants chiefly rely are marked with asterisks.  *See* D.C. Cir. Rule 28(a)(2).

- ix -

*Dantran, Inc. v. Dep't of Labor*,
    171 F.3d 58 (1st Cir. 1999) .......................................................36

*Diamond Roofing v. OSHRC*,
    528 F.3d 645 (5th Cir. 1976) .....................................................52

*Duchek v. Nat'l Transp. Safety Board*,
    364 F.3d 311 (D.C. Cir. 2004).....................................................53

*Emery Mining Co. v. Secretary of Labor, Mine Safety and Health Administration*,
    744 F.2d 1411 (10th Cir. 1984)...................................................43

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ...................................................................35

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ...................................................................40

*Helvering v. Stockholms Enskilda Bank*,
    293 U.S. 84 (1934) .....................................................................40

*Illinois Cent. R.R. v. Norfolk & W. Ry.*,
    385 U.S. 57 (1966) .....................................................................57

*Kay v. F.C.C.*,
    396 F.3d 1184 (D.C. Cir. 2005).................................................57

*Kent Nowlin Const. Co. v. Occupational Safety and Health Review Com'n*,
    593 F.2d 368 (10th Cir. 1979)....................................................52

*L.R. Willson & Sons, Inc. v. Donovan*,
    685 F.2d 664 (D.C. Cir. 1982)....................................................53

*Lamie v. United States*,
    540 U.S. 526 (2004) ...................................................................38

*\*Maryland General Hospital, Inc. v. Thompson*,
    308 F.3d 340 (4th Cir. 2002).............................................. 41, 42

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,
    979 F.2d 227 (D.C. Cir. 1992)....................................................36

*NRDC v. EPA*,
  489 F.3d 1250 (D.C. Cir. 2007)..........................................................39

*Pfizer, Inc. v. Heckler*,
  735 F.2d 1502 (D.C. Cir. 1984)..........................................................36

*Pharmaceutical Research and Manufacturers of America v. Thompson*,
  362 F.3d. 817 (D.C. Cir. 2004)..........................................................35

*Roberto v. Dep't of Navy*,
  440 F.3d 1341 (Fed. Cir. 2006) .........................................................39

*Rowan Cos. v. United States*,
  452 U.S. 247 (1981) ..........................................................................45

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) ..........................................................................37

*\*Sorenson v. Sec'y of the Treasury*,
  475 U.S. 851 (1986) .................................................................. 39, 40

*Tenet HealthSystems HealthCorp. v. Thompson*,
  254 F.3d 238 (D.C. Cir. 2001)..........................................................35

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994) .................................................................. 36, 43

*United States v. Levin*,
  496 F.Supp.2d 116 (D.D.C. 2007) ....................................................39

*Washington Hosp. Ctr. v. Bowen*,
  795 F.2d 139 (D.C. Cir. 1986)........................................................7, 8

*Weaver v. U.S. Information Agency*,
  87 F.3d 1429 (D.C. Cir. 1996)....................................................39, 40

## Statutes

5 U.S.C. § 706(2)(A)..........................................................................35

5 U.S.C. § 706(2)(E) ..........................................................................35

5 U.S.C. ch. 7 .............................................................................35

28 U.S.C. § 1291 .........................................................................4

42 U.S.C. §§ 1395-1395ggg ......................................................5

42 U.S.C. § 1395c .......................................................................7

42 U.S.C. § 1395cc .....................................................................5

42 U.S.C. § 1395d .......................................................................7

42 U.S.C. § 1395f(b) (1982) .......................................................7

42 U.S.C. § 1395g .................................................................5, 7

42 U.S.C. §§ 1395g, 1395h (2003) ...........................................22

42 U.S.C. § 1395oo(a) ..............................................................24

42 U.S.C. § 1395oo(f) ..........................................................3, 30

42 U.S.C. § 1395oo(f)(1) ...........................................................35

42 U.S.C. § 1395ww ............................................................7, 8, 30

*42 U.S.C. § 1395ww(a)(2) ...................................................9, 39

42 U.S.C. § 1395ww(g)(1) ..........................................................8

42 U.S.C. § 1395x(b) ..................................................................7

42 U.S.C. § 1395x(ccc) .............................................................19

*42 U.S.C. § 1395x(e) ...................................... 4, 6, 13, 18, 22, 26, 34, 39, 41, 42, 47

42 U.S.C. § 1395x(u) ..................................................................5

42 U.S.C. § 1395x(v)(1)(A) ........................................................7

42 U.S.C. § 1395x(ccc)(4)(A)....................................................22

Medicare Prescription Drug, Improvement, And Modernization Act of 2003, P.L. 108-173, § 911, 117 Stat. 2066.....................................................................23

Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4006(b)(1), 101 Stat. 1330 (1987) .................................................................................8

**Regulations**

42 C.F.R. § 405.1801(b)(1)...................................................................22

42 C.F.R. § 405.1803 .........................................................................22

42 C.F.R. § 405.1875(a)(1)..................................................................31

42 C.F.R. § 412.22(e)................................................................... 21, 22

42 C.F.R. § 412.22(e)(v)......................................................................22

42 C.F.R. § 412.23(e)................................................................... 19, 21

*42 C.F.R. § 412.300(b) ............................ 1, 4, 14, 27-33, 37-48, 50, 52, 54-55, 59

*42 C.F.R. § 412.300(b)(1)....................................................................47

*42 C.F.R. § 412.300(b)(1)-(4)....................................................... 26, 42

*42 C.F.R. § 412.300(b)(2), (3), (4) .........................................................47

42 C.F.R. § 412.304(c)(2) .............................................................. 11, 25, 48

42 C.F.R. § 412.324(b)(1)............................................................... 11, 25

42 C.F.R. § 413.20 ...........................................................................22

42 C.F.R. § 413.24 ...........................................................................22

42 C.F.R. § 413.24(f) ........................................................................23

42 C.F.R. § 413.50 ...........................................................................22

42 C.F.R. § 413.130 .................................................................. 7, 54, 58

42 C.F.R. part 482 ................................................................................49

**Miscellaneous**

56 Fed. Reg. 43358 (Aug. 30, 1991) ........................................... 9, 10, 12

56 Fed. Reg. 8476 (Feb. 28, 1991) ...........................................................9

57 Fed. Reg. 39746-01 (Sept. 1, 1992) .............................. 10, 11, 12, 13, 46, 50, 56

67 Fed. Reg. 31404 (May 9, 2002) ................................................... 10, 11

67 Fed. Reg. 49982-01 (Aug. 1, 2002) ...................................... 11, 14, 25

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| *Augusta* AR ___ | Administrative Record filed on April 8, 2010, at Docket Entry 13, in *Select Specialty Hospital – Augusta, Inc., et al., v. Kathleen Sebelius, Secretary, United States Department Of Health And Human Services, Defendant-Appellee*, No. 1:09-cv-2362 (D.D.C.) |
| *Augusta* DE ___ | Docket Entry in *Select Specialty Hospital – Augusta, Inc., et al., v. Kathleen Sebelius, Secretary, United States Department Of Health And Human Services, Defendant-Appellee*, No. 1:09-cv-2362 (D.D.C.) |
| *Bloomington* AR ___ | Administrative Record filed on Feb. 22, 2010, at Docket Entry 10, in *Select Specialty Hospital – Bloomington, Inc., et al., v. Kathleen Sebelius, Secretary, United States Department Of Health And Human Services, Defendant-Appellee*, No. 1:09-cv-2008 (D.D.C.) |
| *Bloomington* DE ___ | Docket Entry in *Select Specialty Hospital – Bloomington, Inc., et al., v. Kathleen Sebelius, Secretary, United States Department Of Health And Human Services, Defendant-Appellee*, No. 1:09-cv-2008 (D.D.C.) |
| *Bloomington* SAR ___ | Administrative Record filed on Dec. 6, 2011 at Docket Entry 36 in *Select Specialty Hospital – Bloomington, Inc., et al., v. Kathleen Sebelius, Secretary, United States Department Of Health And Human Services, Defendant-Appellee*, No. 1:09-cv-2008 (D.D.C.) |
| JA____ | Deferred Joint Appendix |
| HHS | The U.S. Department of Health and Human Services |
| NPR | Notice of Program Reimbursement |
| Secretary | The Secretary of the U.S. Department of Health and Human Services |

Select                          Select Medical Corporation

## INTRODUCTION

At Congress's direction, the Secretary of the U.S. Department of Health and Human Services has promulgated regulations for the Medicare program that afford a "new hospital" a favorable reimbursement rate for capital-related costs associated with providing inpatient services to Medicare beneficiaries.  Under the regulations, which are effective for cost-reporting periods beginning on or after October 1, 2002, a hospital that has operated for less than two years is entitled to be reimbursed 85% of its actual, reasonable capital-related costs.  In contrast, a hospital that has operated for two years or more may receive reimbursement for capital-related costs only under Medicare's inpatient prospective payment system, which generally provides lower reimbursement rates.

The question presented in these cases is whether Appellants are "new hospitals" as that term is defined in the relevant Medicare regulation, 42 C.F.R. § 412.300(b), and thereby entitled to be reimbursed for 85% of their actual, reasonable capital-related costs for cost reporting periods beginning on or after October 1, 2002.  The facts are undisputed and demonstrate that Appellants are new hospitals under 42 C.F.R. § 412.300(b).  Each Appellant is a long-term care hospital, founded as a separate and distinct corporation, and owned at all times by Select Medical Corporation.  None of the Appellants operated in any capacity before the cost reporting periods at issue.  Each went through a capital-intensive

start-up process just before those initial cost reporting periods to acquire the assets, staff, and approvals need to commence operations.  Each Appellant acquired its assets (including its lease rights to occupy and develop a site of operations) through arm's length transactions with unrelated parties, at commercially reasonable terms.  And each Appellant acquired new licenses, bed rights, and other regulatory approvals, including new approvals to participate in the Medicare program.  Each commenced operations during the cost reporting periods at issue.

Nevertheless, a three-member majority of the Provider Reimbursement Review Board ruled that Appellants did not qualify as "new hospitals" because each had leased a physical space that had been used by another, unrelated hospital in the past.  The majority looked at the regulatory definition of a "new hospital," which states that a "new hospital" is "a hospital that has operated (under previous or present ownership) for less than 2 years[,]" and concluded that the definition was ambiguous in its use of the term "hospital."  The majority believed that the definition required an "analysis" of the particular capital assets acquired by a new provider and it held that the definition should be interpreted not to cover an institution that indisputably has operated for less than two years, if the institution leases space previously used by another, unaffiliated hospital.  Although two Board members vigorously dissented from these rulings, the Secretary declined to review the decisions.  For its part, the district court agreed that the term "hospital" as used

- 2 -

in the regulation is ambiguous, deferred to the Board's construction of that term, and affirmed.

These rulings are untenable.  The three-member majority of the Board erred by focusing not on the newness of the institution entering the field and providing services to patients, but on the provenance of one of the capital assets acquired by the new entrant.  The majority improperly ignored the definition of a "hospital" under the Medicare statute and reached conclusions that are inconsistent with the statutory language, scheme, and purpose, and with the Secretary's own regulations as well.  The majority's approach rested on principles and policies not mandated by Congress or the Secretary and made factual presumptions about Appellants' capital costs that are not supported by substantial evidence and are demonstrably wrong.  This Court should reverse and direct the district court to enter summary judgment in favor of each Appellant that filed a cost report for a period that began on or after October 1, 2002.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over *Select Specialty Hospital - Bloomington, Inc. v. Sebelius*, No. 1:09-cv-2008, and *Select Specialty Hospital - Augusta, Inc.*, No. 1:09-cv-2362, pursuant to 42 U.S.C. § 1395oo(f).  JA____ (*Bloomington* DE 1 [¶¶ 9-12]); JA____ (*Augusta* DE 1 [¶¶ 8-11]).  The district court issued a final decision in the each case on September 20, 2012.  JA____

- 3 -

(*Bloomington* DE 48); JA____ (*Augusta* DE 53).  Appellants filed timely notices

of appeal on November 7, 2012.  JA____ (*Bloomington* DE 49); JA____ (*Augusta*

DE 54).  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the determination of the Provider Reimbursement Review

Board (the "Board") that Appellants are not "new hospitals" pursuant to a

Medicare reimbursement regulation, 42 C.F.R. § 412.300(b), is erroneous and

reversible because the Board improperly ignored the statutory definition of

"hospital" set forth in Title XVIII of the Social Security Act, 42 U.S.C. § 1395x(e),

and construed the regulation in an arbitrary, capricious, and unreasonable way.

2.      Whether, assuming the Board's construction of the regulation is

sustainable, the Board's rulings nevertheless must be reversed because they are not

supported by substantial evidence.

## PERTINENT STATUTES AND REGULATIONS

The statutes and regulations relevant to this case are set forth in the

addendum to this brief.

## STATEMENT OF THE CASE

**I.    The Statutory And Regulatory Background**

   **A.    Under The Medicare Statute, "Hospitals" And Other "Providers Of Services" Enter Into Agreements With The Secretary To Provide Health Care Services To Eligible Medicare Beneficiaries.**

Title XVIII of the Social Security Act (the "Medicare statute") establishes the Medicare program, a federal program of health insurance for the elderly and disabled.  42 U.S.C. §§ 1395-1395ggg.  Under the Medicare statute, the Secretary of the U.S. Department of Health and Human Services (the "Secretary") enters into agreements with "providers of services" that are willing to participate in the program and be reimbursed by the program for services rendered to Medicare beneficiaries.  42 U.S.C. §§ 1395g, 1395cc.

Part E of the Medicare statute defines a "provider of services" as:

a *hospital*, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, for purposes of section 1395f(g) and section 1395n(e) of this title, a fund.

42 U.S.C. § 1395x(u) (emphasis added).  This case is concerned with Medicare "providers of services" that are "hospital[s]."

Part E of the Medicare statute defines a "hospital" as "an institution which—

   **(1)** is primarily engaged in providing, by or under the supervision of physicians, to inpatients (A) diagnostic services and therapeutic services for medical diagnosis, treatment, and care of injured, disabled, or sick persons, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons;

(2) maintains clinical records on all patients;

(3) has bylaws in effect with respect to its staff of physicians;

(4) has a requirement that every patient with respect to whom payment may be made under this subchapter must be under the care of a physician, ***;

(5) provides 24-hour nursing service rendered or supervised by a registered professional nurse, and has a licensed practical nurse or registered professional nurse on duty at all times ***;

(6)(A) has in effect a hospital utilization review plan *** and (B) has in place a discharge planning process ***;

(7) in the case of an institution in any State in which State or applicable local law provides for the licensing of hospitals, (A) is licensed pursuant to such law or (B) is approved, by the agency of such State or locality responsible for licensing hospitals, as meeting the standards established for such licensing;

(8) has in effect an overall plan and budget ***; and

(9) meets such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution."

42 U.S.C.A. § 1395x(e).  In other words, the statute defines a "hospital" as an "institution" and a "provider of services" that renders certain services to inpatients, is properly licensed, has bylaws that govern its staff of physicians, follows certain plans and processes, has a budget, and keeps certain books and records.

**B.    The Medicare Program Reimburses Hospitals For Their Operating Costs And Capital-Related Costs Associated With Providing Inpatient Hospital Services, According To Payment Methodologies Mandated By Congress And Implemented By The Secretary.**

Under Part A of the statute, the Medicare program covers services hospitals furnish to inpatients who are eligible for benefits.  42 U.S.C. § 1395c (description of the Medicare hospital insurance program); § 1395d (scope of benefits for "inpatient hospital services" and other services); § 1395g (payments to providers of services under Part A); § 1395ww (payments to hospitals for "inpatient hospital services"); *see also* 42 U.S.C. § 1395x(b) (defining "inpatient hospital services").

The Medicare program's method of paying hospitals for "inpatient hospital services" has evolved over time.  For cost reporting periods beginning before October 1, 1983, hospitals were paid for the "reasonable cost" of inpatient hospital services furnished to Medicare beneficiaries.  Under the reasonable cost system, the program paid for all costs—operating costs and capital-related costs—the hospital "actually incurred," exclusive of any costs "found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C. §§ 1395f(b) (1982); 1395x (v)(1)(A); *Washington Hosp. Ctr. v. Bowen*, 795 F.2d 139, 141 (D.C. Cir. 1986).  Capital-related costs include depreciation, interest, taxes, insurance, leases, and similar expenses for plant, fixed equipment and movable equipment.  42 C.F.R. § 413.130.

In 1983, Congress amended the Medicare statute and directed the Secretary to implement a "prospective payment system," for reimbursing hospitals for the operating costs they incur in providing inpatient hospital services to Medicare beneficiaries. *See* 42 U.S.C. § 1395ww; *Bowen*, 795 F.2d at 141-142. Then, in 1987, Congress amended the statute again and directed the Secretary to expand the inpatient prospective payment system to include hospitals' capital-related costs of providing inpatient services to Medicare beneficiaries. *See* Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, § 4006(b)(1), 101 Stat. 1330 (1987) (amending 42 U.S.C. § 1395ww(g)(1)).

Under the inpatient prospective payment system, the program reimburses a hospital for the operating costs and capital-related costs associated with Medicare inpatient hospital stays according to prospectively-determined reimbursement rates that are derived from industry-wide averages. *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999). Because, under the inpatient prospective payment system, a hospital's reimbursement rates are fixed in advance and constant regardless of the costs the hospital actually incurs, the prospective payment system encourages hospitals to control their costs. *Id.*

However, when Congress directed the Secretary to implement the inpatient prospective payment system, it recognized that: (1) some types of hospitals operate under special circumstances that may result in atypical operating or capital-

- 8 -

related costs; and (2) the inpatient prospective payment system would not

adequately reimburse those hospitals.  Accordingly, Congress directed that the

Secretary "shall provide" exemptions and exceptions to the inpatient prospective

payment system that take into account the:

> the special needs of sole community hospitals, *of new hospitals*, of
> risk based health maintenance organizations, and of hospitals which
> provide atypical services or essential community services….

42 U.S.C. § 1395ww(a)(2) (emphasis added).  These cases are concerned with the

regulations the Secretary adopted exempting "new hospitals" from the prospective

payment system for capital-related costs.

### C.     "New Hospitals" Are Exempt From Medicare's Prospective Payment System With Respect To The Reimbursement Of Their Capital-Related Costs.

In 1991, the Secretary began to expand the inpatient prospective payment

system to include capital-related costs.  56 Fed. Reg. 8476 (Feb. 28, 1991)

(proposed rule).  The Secretary established a new payment system for capital-

related costs that provided for a 10-year transition from the traditional, reasonable

cost payment system to the inpatient prospective payment system.  56 Fed. Reg.

43358 (Aug. 30, 1991) (final rule).

During the 10-year transition, the Secretary's regulations exempted any

"new hospital" from the inpatient prospective payment system for the hospital's

first two years of operation.  During that two-year period, a new hospital would be

paid 85% of the reasonable capital-related costs associated with providing inpatient hospital services to Medicare beneficiaries.  56 Fed. Reg. at 43362, 43453.  After two years of operation, the hospital would no longer be considered new and its capital-related costs would be reimbursed under the prospective payment system. *Id.*; 57 Fed. Reg. 39746-01, 39789 (Sept. 1, 1992) (final rule).

In 2002, after the 10-year transition, the Secretary proposed to make the "new hospital" exemption a permanent feature of the inpatient prospective payment system for capital-related costs (the "capital prospective payment system") for cost reporting periods beginning on or after October 1, 2002.  67 Fed. Reg. 31404, 31488-89 (May 9, 2002) (proposed rule).  The Secretary explained that new entrants into the field of inpatient hospital services should be exempt from the capital prospective payment system because that system bases payments on "industry-wide" averages for capital-related costs—averages that do not take into account the typical "experience" of new entrants and the special circumstances new entrants face during their first years of operation.  *Id.* at 31489.

In particular, the Secretary noted that, during its initial years of operation, a hospital:  may incur unusually high capital expenditures; may have low occupancy; and may not be sufficiently utilized by Medicare beneficiaries to cover the capital-related costs of providing inpatient hospital services to those individuals.  *Id.* at 31488-89.  The Secretary also noted that such a hospital may not have capital

reserves comparable to established hospitals and that reimbursing such hospitals under the capital prospective payment system from the outset could limit or prevent them from accruing those reserves.  *Id.*

In due course, the Secretary issued a final rule that made the "new hospital" exemption a permanent feature of the capital prospective payment system.  67 Fed. Reg. 49982-01, 50101 (Aug. 1, 2002) (final rule).  Under the regulations adopted at that time and in effect for the cost reporting periods beginning on or after October 1, 2002, a "new hospital" is entitled to be paid 85% of its reasonable actual capital-related costs associated with inpatient hospital services to Medicare beneficiaries during its first two years of operation, instead of being reimbursed at the lower rates set by the capital prospective payment system.  42 C.F.R. §§ 412.304(c)(2), 412.324(b)(1).

### D. Medicare's Capital-Cost Reimbursement Regulations Always Have Defined A "New Hospital" As A "Hospital" That Has Operated For Less Than Two Years.

In 1991, when the Secretary first promulgated the "new hospital" exemption, a "new hospital" was defined as:

> a hospital that has operated (under previous or present ownership) for less than 2 years and does not have a 12-month cost reporting period ending on or before December 31, 1990, or a combination of cost reporting periods ending on or before December 31, 1990 that covers at least 12 months.

56 Fed. Reg. at 43449.  The Secretary amended the definition the following year.

The regulation continued to define "a new hospital" as "a hospital that has operated

(under previous or present ownership) for less than 2 years."  57 Fed. Reg. at

39827.  The 1992 amendment added new language stating that "[t]he following

hospitals are not new hospitals:"

> (1) A hospital that builds new or replacement facilities at the same or another location even if coincidental with a change of ownership, a change in management, or a lease arrangement.
>
> (2) A hospital that closes and subsequently reopens.
>
> (3) A hospital that has been in operation for more than 2 years but has participated in the Medicare program for less than 2 years.
>
> (4) A hospital that changes its status from a hospital that is excluded from the prospective payment systems to a hospital that is subject to the capital prospective payment systems.

*Id.*

At the time of the 1992 amendment, the Secretary stated the intent to ensure

that the "new hospital" exemption would be provided to "new entrants" that:

(1) do not have a "historic asset base" prior to entering the "field" of hospital

services; (2) "have incurred start-up costs to become operational[;]" and (3) "need

to build a relationship with the community."  57 Fed. Reg. at 39790, 39804

(describing these as "the basic premises" of the "new hospital" exemption).  In

adding subparts (1)-(4) to the regulation, the Secretary also stated the intent to make clear that the "new hospital" exemption is *not* available to an *existing* "hospital" that merely experiences a change in institutional management or ownership, a transformation of its asset base, or a change in status in the Medicare program. *Id.* The Secretary concluded that "it would be inappropriate to provide special payment protection to a hospital simply because the hospital experiences a significant [change] in its asset base." *Id.* at 39790. Further:

> If we were to allow new facilities *built by existing hospitals* to qualify for the new hospital exemption, we would provide an inappropriate incentive for a hospital to replace existing plant instead of renovating or expanding its current facility. If the capital prospective payment system is to be effective in encouraging prudent capital spending, *payment policies must be neutral with respect to decisions concerning whether to renovate or replace existing assets.* Consistent with the need to provide neutral incentives, the proposed changes in the new hospital definition clarify that *existing hospitals* that move, realign, or replace the physical assets from which they operate will not qualify as a new hospital regardless of the mode through which such capital changes are effected.

*Id.* (emphasis added). In amending the regulation to make it clearer that "new hospital" status is *not* available to an *existing* "hospital" that experiences a change in institutional management or ownership, assets, or Medicare status, the Secretary consistently used the term "hospital" in a manner provided by 42 U.S.C. § 1395x(e)—*i.e.*, to refer to an institution that is a provider of services that has the characteristics set forth in § 1395x(e). *Id.*

- 13 -

In 2002, when the Secretary acted to make the new hospital exemption permanent, the Secretary did not alter the regulatory definition of a "new hospital." To the contrary, the Secretary *reaffirmed* that the definition of a "new hospital" was tailored to cover new entrants that did not have a "historic asset base" prior to entering the field of hospital services and that incurred start-up costs to become operational.  67 Fed. Reg. at 50101.  Thus, the version of 42 C.F.R. § 412.300(b) that applies to these cases continues to define a "new hospital" as "a hospital that has operated (under previous or present ownership) for less than 2 years[,]" and it continues to provide, in the four subparts, that a "new hospital is not" an existing hospital that experiences a change in institutional management or ownership, assets, or Medicare status.

The issue on appeal is whether the Board erred when it concluded that Appellants with cost reporting periods beginning on or after October 1, 2002, were not "new hospitals" as defined by 42 C.F.R. § 412.300(b), and thus not entitled to be reimbursed at 85% of their actual, reasonable capital-related costs.

## II.    Factual Background

### A.    None Of The Appellant Hospitals Operates Before The Cost Reporting Periods At Issue; Each Goes Through A Capital-Intensive Start-Up Process Before The Cost Reporting Periods In Order To Become An Operating Hospital.

The facts relevant to these appeals are undisputed.  Each of the Appellants (individually, a "Hospital;" collectively, the "Hospitals") is a separate corporation

owned by Select Medical Corporation ("Select").  Select owns more than 90 long-term care hospitals in 25 states.  *Bloomington* AR 214; *Augusta* AR 129.

None of the Hospitals operated in any capacity prior to the cost reporting periods at issue.  JA____ (*Bloomington* AR 781, ¶¶ 4-5); JA____ (*Augusta* AR 230, ¶¶ 5, 6).  Rather, each Hospital was incorporated, organized, and established by Select as a new institution and provider of services.  Each Hospital was designed to operate as a long-term care hospital—*i.e.*, a hospital that serves highly acute inpatients whose conditions require a long hospital stay and specialized care.  Each Hospital also went through a capital-intensive start-up process, just before the cost reporting periods at issue, to acquire the assets, staff, and regulatory approvals needed to become an operating hospital.  JA____ (*Bloomington* AR 301-302; *Augusta* AR 186-87).  As described *infra*, each Hospital's start-up process was similar to that of any new entrant into the field of inpatient hospital services.

### 1.    Each Hospital Picks A Site From Which To Operate And Acquires, Via Arm's-Length Lease Agreements With Unaffiliated Entities, The Rights To Occupy The Site.

For starters, the Hospitals entered into lease agreements with various landlords for the right to possess and occupy real property from which to operate and provide services to inpatients.  In each instance, the Hospital and its respective landlord had no prior relationship with another, dealt at arm's length, and agreed on commercially reasonable terms for the lease, including commercially

reasonable rent. *Bloomington* AR 298, 502-28, 536-62, 563-600; *Augusta* AR 183, 849-912, 914-85, 987-1038, 1040-1109, 1111-63, 1169-1212, 1214-78, 1280-1335, 1337-1427, 1429-79, 1515-69, 1571-1602, 1623-75, 1679-1783, 1785-1851, 1853-1962.  Each Hospital has the exclusive right to possess and occupy the leased premises, and those leased premises are separate and distinct from adjoining premises. *Bloomington* AR 502-28, 536-62, 563-600; *Augusta* AR 183, 849-912, 914-85, 987-1038, 1040-1109, 1111-63, 1169-1212, 1214-78, 1280-1335, 1337-1427, 1429-79, 1515-69, 1571-1602, 1623-75, 1679-1783, 1785-1851, 1853-1962. With two notable exceptions, the landlords are themselves hospitals. *See infra*, p. 20.

### 2. Each Hospital Plans The Development Of, Then Develops, Its Chosen Site Of Operations.

After acquiring new lease rights, each Hospital went through a planning and design process for the development of its chosen site of operations.  That process included the drafting of architectural plans for the site and the review and approval of those plans by regulators.  JA____ (*Bloomington* AR 297-303; *Augusta* AR 183-88).  The process also including soliciting bids and selecting general contractors and engineers to carry out the plans. *Id.*

Each Hospital's plans for the sites required months to carry out and included demolition and preparation of the site, construction, and finishing work. *Id.* Again, this development process was typical of any new entrant into the field of

inpatient hospital services.  The demolition and preparation phase included special procedures to isolate the site from other parts of the landlord's property and control dust and debris.  It also included an asbestos survey and, if necessary, asbestos abatement.  Any pre-existing equipment, fixtures, and hazardous materials were removed. JA_____ (*Bloomington* AR 298-303; *Augusta* AR 183-89).

The construction phase included installation of new electrical systems, medical gas systems, and data telemetry systems for monitoring patients' conditions.  It also included the construction of dedicated spaces for inpatient beds, clinical work, x-ray services, lab services, a pharmacy, and clinical recordkeeping operations.  *Id.*

The finishing phase included construction and installation of new flooring, wall coverings, ceilings, office equipment, and medical equipment, including beds, bedside treatment equipment, ventilators, x-ray machines, and laboratory machines.  Signage identifying the site as the location of a Select hospital also was installed.  *Id.*

In developing each site, the Hospitals had to comply with the most recent life-safety codes and building codes issued by the National Fire Protection Association and the American Institute of Architects, as well as the requirements of the Americans with Disabilities Act, and state and local requirements for electrical, plumbing, and mechanical systems.  *Id.*  The Hospitals could not rely on

older codes or requirements that had been in effect when the leased premises

originally were built. *Id.*

### 3. Each Hospital Obtains New Licenses, Accreditations, And Certifications Necessary To Operate As A Hospital And Begins Operations As A Medicare-Certified Hospital.

While planning and developing its chosen sites of operations, each Hospital

also began the process of obtaining the regulatory approvals necessary to operate

as a hospital, including approvals to participate as hospitals in the Medicare

program. JA____ (*Bloomington* AR 298-303; *Augusta* AR 183-89). In some

cases, state rules required the Hospital to obtain a certificate of need certifying that

there was a need in the community for the services the Hospital would provide.

JA____ (*Bloomington* AR 299; *Augusta* AR 184). Where required, each Hospital

obtained the requisite certificate of need. *Id.*

It is undisputed that each Hospital obtained new licenses, accreditations, and

certifications just before the start of the cost reporting periods at issue in this case.

JA____ (*Bloomington* AR 781, ¶¶ 4-5); JA____ (*Augusta* AR 230, ¶¶ 5, 6). None

acquired their regulatory approvals or bed rights from any existing hospital.

JA____ (*Bloomington* AR 21); JA____ (*Augusta* AR 23).

With respect to the Medicare program, each Hospital sought to be certified

as a "long-term care hospital." A long-term care hospital is an institution that

satisfies all of the requirements of a "hospital" under 42 U.S.C. § 1395x(e) and that

is engaged primarily in providing services to inpatients whose medical conditions require a long hospital stay and specialized care.  42 U.S.C. § 1395x(ccc) (defining a "long-term care hospital"); 42 C.F.R. § 412.23(e) (requirements for being certified as a long-term care hospital).  To this end, each Hospital entered into a new Medicare provider agreement with the Secretary and was issued a new Medicare provider number just before the start of the cost reporting periods at issue in this case.  JA____ (*Bloomington* AR 781, ¶¶ 4, 5); JA____ (*Augusta* AR 230, ¶¶ 5, 6).

Each Hospital initially was certified as an acute care hospital under the Medicare program, commenced operations as such a hospital, and spent its first several months of operations providing inpatient hospital services to patients and developing a factual record showing that it met all the requirements of a Medicare long-term care hospital.[2]  JA___ (*Bloomington* AR 10, 298-305, 781; *Augusta* AR 13, 230).  During the months when it operated as a certified acute care hospital, each Hospital was subject to the inpatient prospective payment system with respect to its operating and capital costs (including the new hospital exemption from the capital prospective payment system).  At the end of this initial operations period,

---

[2]     In order to be certified as a long-term care hospital, a hospital must provide the Secretary with six months of data showing that hospital has inpatient stays averaging 25 days or longer, provides specialized programs of care, and meets other requirements.  42 U.S.C. § 1395x(ccc); 42 C.F.R. § 412.23(e).

each Hospital received an additional certification as a Medicare long-term care

hospital and a new long-term care hospital provider number.  *See generally*

*Bloomington* AR 82-199, 318, 787-836; *Augusta* AR 203, 420-776.

### 4. Two Of The Hospitals Operate On Sites Where No Other Hospital Operates.

Two of the Hospitals—Victoria Healthcare, Inc. ("Victoria") and Select

Specialty-South Dallas ("Select-South Dallas")—operate on sites where no other

hospital operates.  Like any new entrant, these Hospitals went through the start-up

process described above.

Victoria, which began operations in 2003, leased a building that had been a

site of an unaffiliated medical services provider from October 1982 through

September 1993.  *Bloomington* SAR 1462.  Between September 1993 and 2003,

the site was not used for medical purposes.  *Id.*  Victoria's landlord is not a

hospital.  *Bloomington* AR 708.

Select-South Dallas began operations in August 2002.  *Id.*  Select-South

Dallas leased a building in which another, unaffiliated medical services provider

had operated between August 1994 and February 2000.  *Id.*  Between February

2000 and August 2002, the site was not used for medical purposes.  *Id.*  Select-

South Dallas's landlord also is not a hospital.  *Bloomington* AR 715.

### 5.     The Other Hospitals Operate In Buildings Or On Campuses Where Other, Unaffiliated Hospitals Also Operate.

Each of the other Hospitals operates within a building or on a campus that also is used by another, unrelated hospital.  Medicare-participating hospitals can engage in this type of co-location arrangement pursuant to 42 C.F.R. § 412.22(e).  Such a co-location arrangement can be called a "hospital-within-a hospital" ("HIH") arrangement because of the physical proximity of the hospitals and the fact that one hospital typically is larger and leases or sub-leases physical space to the other hospital.  JA___ (*Bloomington* AR 781, ¶ 3); JA___ (*Augusta* AR 230, ¶ 3).  Because Medicare-certified long-term care hospitals, like the Hospitals here, often have a small number of beds, it is common for them to lease, develop, and operate from space within a building or campus that also is being used by other hospitals under HIH arrangements.  Indeed, Medicare regulations governing long-term care hospitals expressly permit such arrangements.  42 C.F.R. § 412.23(e).

As required by 42 C.F.R. § 412.22(e), each HIH Hospital is legally, organizationally, and functionally separate from any other hospital that operates within the same building or on the same campus.  Each HIH Hospital has a governing board, chief executive officer, chief medical officer, and medical staff that is separate from, and not employed or controlled by, any other hospital that operates within the same building or campus.  *Bloomington* AR 214-15, 217-21, 335, 781; *Augusta* AR 129-30, 132-37, 183, 220, 230, 851, 916, 989, 1042, 1113.

Furthermore, as noted *supra*, each HIH Hospital has the exclusive right to possess and occupy its chosen site of operations and has all of the characteristics of a "hospital" under 42 U.S.C. § 1395x(e).  In particular, each performs all the functions of a hospital described in 42 C.F.R. § 412.22(e)(v).  *E.g., Bloomington* AR 412-17, 781; *Augusta* AR 230, 372-74.  Any patient who wishes to receive treatment from an HIH Hospital must obtain a physician's order for admission, meet the HIH Hospital's admissions criteria, and go through a formal process of being admitted as an inpatient of the HIH Hospital.  42 U.S.C. § 1395x(ccc)(4)(A).  Such a patient must be discharged, by a physician's order, as a patient of any other hospital, including from a hospital that operates within the same building and or on the same campus.  *Id.*

### B.  A Medicare Fiscal Intermediary Denies The Hospitals' Requests For Reimbursement Of Their Capital-Related Costs At The "New Hospital" Rate.

Each Hospital submitted a cost report to its Medicare fiscal intermediary[3] covering the initial months during which the Hospital was certified as a general

---

[3]     During the cost-reporting periods at issue, a component within the U.S. Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), contracted with private insurance companies to act as "fiscal intermediaries" and determine the payments due to hospitals and other "providers of services."  42 U.S.C. §§ 1395g, 1395h (2003).  The intermediary was responsible for reviewing each cost report submitted by a hospital or other provider at the end of the institution's fiscal year and issuing a Notice of Program Reimbursement that set forth the amount of allowable Medicare payments. 42 C.F.R. §§ 405.1801(b)(1), 405.1803, 413.20, 413.24, 413.50.  Fiscal intermediaries

acute care hospital and subject to the inpatient prospective payment system (*i.e.*, the initial months of operations before the Hospital received its additional certification as a long-term care hospital).  JA___ (*Bloomington* AR 10); JA___ (*Augusta* AR 13 n.1).   Each Hospital asked to be reimbursed as a "new hospital" and paid 85% of its reasonable actual capital-related costs, instead of the lower rate provided by the capital prospective payment system.  JA___ (*Bloomington* AR 314-15); JA___ (*Augusta* AR 199-200).  The capital-related costs for which the Hospitals sought reimbursement were similar to the capital-related costs *any* new entrant into the field of inpatient hospital services would incur, including costs incurred for rent of its site of operations, site planning and development, improvements, purchase of fixed equipment, major moveable equipment, computer equipment and software, and amortized finance costs.  *E.g.*, *Augusta* AR 904, 911.

The intermediary, however, issued a Notice of Program Reimbursement ("NPR") to each Hospital in which it eliminated the "new hospital" designation and reduced each Hospital's reimbursement based on the lower rate set by the

---

were replaced, effective October 2005, with "Medicare Administrative Contractors."  *See* Medicare Prescription Drug, Improvement, And Modernization Act of 2003, P.L. 108-173, § 911, 117 Stat. 2066; 42 U.S.C. § 1395h; 42 C.F.R. § 413.24(f).

inpatient prospective payment system.  JA___ (*Bloomington* AR 10); JA___ (*Augusta* AR 14).[4]

### C. In Sharply Split Decisions, The Provider Reimbursement Review Board Affirms The Intermediary's Decisions.

Each of the Hospitals timely appealed the intermediary's NPRs to the Provider Reimbursement Review Board (the "Board"), an administrative tribunal within HHS established to hear Medicare reimbursement disputes.  JA___ (*Bloomington* AR 10); JA___ (*Augusta* AR 14); 42 U.S.C. § 1395oo(a). Significantly, there was no dispute about the bona fides of the Hospitals' capital-related costs, and no dispute that the Hospitals are entitled to reimbursement from the Medicare program for those costs.  Rather, the appeals were limited to whether the intermediary erred by eliminating the "new hospital" designation and reducing each Hospital's capital-cost reimbursement based on the lower rate established by of the inpatient  prospective payment system.  The administrative appeals were

---

[4]    The intermediary's actions were a radical departure from its past practices. Prior to the cost reporting periods at issue, approximately 30 other Select long-term care hospitals had submitted Medicare cost reports for their start-up periods and been treated by the intermediary as "new hospitals," eligible for reimbursement of 85% of their reasonable capital-related costs JA___ (*Bloomington* AR 314-15; *Augusta* AR 199-200).  Each of those Select long-term care hospitals operated within leased space in existing buildings and all but one of them were HIH providers.  *Id.*

arranged into four appeals, which were the subject of two separate hearings.

JA___ (*Bloomington* AR 7-24, 25-26); JA___ (*Augusta* AR 10-26, 27-28).[5]

The Board issued two decisions.  The first decision (the "*Bloomington* decision") was issued on August 19, 2009.  JA___ (*Bloomington* AR 7-24).  The second decision (the "*Augusta* decision") was issued on October 15, 2009.  JA___ (*Augusta* AR 10-26).  Each decision was a split, 3-2 vote, with identical reasoning.  The majority (the same in each case) affirmed the intermediary's decisions; the minority (also the same in each case) dissented vigorously.[6]  *Id.*

---

[5]  The hospitals in each of the four "case groups" have common calendar year cost reports and facts.  JA____ (*Bloomington* AR 7) (deciding Board Case Nos. 06-1080G and 06-1081G for Hospitals with cost reporting periods ending in 2002 or 2003); JA____ (*Augusta* AR 10) (deciding Board Case Nos. 06-1078G and 06-1079G for Hospitals with cost reporting periods ending in 2003, 2004, and 2005).

[6]  The *Bloomington* decision differed from the *Augusta* decision in one respect.  In the *Bloomington* appeals, six Hospitals sought treatment as "new hospitals" for fiscal years that began before October 1, 2002.  JA____ (*Bloomington* DE 17-1 (listing six hospitals with so-called "gap year" issues).  The Board ruled, unanimously, that those Hospitals were not eligible for the "new hospital" exemption under any circumstances because the Secretary made 42 C.F.R. §§ 412.304(c)(2), 412.324(b)(1) effective *only* for cost reporting periods beginning *on or after* October 1, 2002.  *See* JA____ (*Bloomington* AR 15-17) (majority opinion), 24 (dissenting opinion); *see also* 67 Fed. Reg. at 50101 (Aug. 1, 2002) (final rule).  Those six Hospitals challenged that aspect of the *Bloomington* decision in the district court and lost; they do not raise that issue before this Court.  Rather, this appeal is concerned only with the denial of "new hospital" status for Hospitals that filed cost reports for periods beginning on or after October 1, 2002.  JA____ (*Bloomington* DE 17-1) (listing the hospitals with such reporting periods).

1.    **The Majority Rules, Erroneously, That The Definition Of A "New Hospital" In The Regulation Is Ambiguous In Its Use Of The Term "Hospital" And Should Be Construed To Exclude An Institution That Has Operated For Less Than Two Years If That Institution Leases A Site Formerly Used By Another, Unrelated Hospital.**

The three-member majority acknowledged, correctly, that all of the Hospitals first commenced operations during the cost reporting periods at issue and had not operated as hospitals previously.  JA___ (*Bloomington* AR 10-11); JA___ (*Augusta* AR 13-14).  The majority also noted, correctly, that none of the subparts to 42 C.F.R. § 412.300(b)(1)-(4) describe any of the Hospitals.  JA___ (*Bloomington* AR 16-17); JA___ (*Augusta* AR 19).  The majority concluded, however, that the relevant language defining a new hospital as "a hospital that has operated (under previous or present ownership) for less than 2 years" was ambiguous in its use of the term "hospital[.]"  JA___ (*Bloomington* AR 16-17); JA___ (*Augusta* AR 18-20).   Instead of looking to the statutory definition of a "hospital" provided by Congress in 42 U.S.C. § 1395x(e), the majority concluded that "it is not clear from the wording of the regulation if the term 'hospital' is defined as to its individual physical assets  . . . [or] the business entity as a whole . . . ." *Id.*

The majority then attempted to resolve the purported ambiguity in the definition by relying upon a statement from the final rulemaking release for the

new hospital exemption that the majority believed reflected the purpose of the

exemption.  Specifically, the majority pointed to the following statement:

> This payment provision was implemented to provide special
> protection to new hospitals during the transition period in response to
> concerns that prospective payments under a [prospective payment]
> system may not be adequate initially to cover the capital costs of
> *newly* built hospitals.  These hospitals may not have sufficient
> occupancy in those initial 2 years and may have incurred significant
> capital startup costs, so that capital prospective payment system
> payments may not be sufficient.

JA___ (*Bloomington* AR 17); JA___ (*Augusta* AR 19-20) (quoting 67 Fed. Reg. at

50101) (emphasis supplied by the Board).

The majority then reasoned that the foregoing statement "requires, at the

very least, an analysis of the physical assets" to determine whether a hospital is a

"new hospital" for purposes of 42 C.F.R. § 412.300(b).  Specifically, the majority

concluded that even if an institution had operated for less than two years (under

previous or present ownership), the Board should consider the history of the assets

that the institution had acquired and the identity of the party that sold or leased

assets to the institution.  The majority grounded this conclusion, not on the text of

42 C.F.R. § 412.300(b) but on the purported "principle" that the "new hospital"

exemption "should be limited to assets for which the Medicare program has not

previously made payment under the reasonable cost principles."  JA___

(*Bloomington* AR 16-17); JA___ (*Augusta* AR 19).  With respect to each

Hospital's lease expenses in particular, the Board then:  (a) noted that "all of the

- 27 -

buildings where the [Hospitals] lease space were operated by another hospital or host hospital for more than 2 years prior to the lease arrangement[;]"and (b) "presume[ed] that the hospital that previously occupied the now-leased space had claimed reimbursement from Medicare for the "original costs associated with the space" (apparently a reference to the cost of constructing the building) (JA____ (*Bloomington* AR 16-17); JA___ (*Augusta* AR 19). On those actual and presumed facts, the Board concluded that treating the Hospitals as "new hospitals" would run afoul of the purported principle against duplicative payments for the costs of capital assets.[7]

---

[7]     As discussed *infra*, pp. 44-56, the majority's reasoning is difficult to understand for at least three reasons. *First*, the provenance of one asset (or even a collection of assets) acquired by the Hospitals in order to become operational does not change the fact that each Hospital is a new entrant into the field of inpatient hospital services. *Second*, the issue is not whether the Hospitals are entitled to be reimbursed for the capital-related costs they are claiming. All parties agree that the Hospitals' capital-related costs are bona fide and that the Hospitals are entitled to *some* reimbursement for their capital-related costs, including the costs associated with leasing their chosen sites of operations. Rather, the dispute is over *the rate at which the Medicare program will reimburse them* for those costs. *Third*, the capital-related costs for which the Hospitals are seeking reimbursement (*e.g.,* lease expenses, the costs associated with making extensive renovations to the space, and the costs of purchasing various medical equipment) are all costs incurred *exclusively* by each Hospital, *not* by the landlord or by any prior occupant of the space. In other words, there simply cannot be any danger of duplicative reimbursements from the program; nor is any supposed danger of duplicative payments solved by denying the Hospitals treatment as new hospitals under 42 C.F.R. § 412.300(b).

The Board did not state where that limiting "principle" came from (it does not appear in any regulation or in the Secretary's statements proposing and adopting the definition of a "new hospital"), nor did the Board cite any evidence supporting its presumption that the Hospitals were seeking to be reimbursed for capital-related costs that had been sought by, and reimbursed to, their lessors or some other prior occupant of the premises.[8]

> **2.     Two Board Members Dissent, Recognizing, Correctly, That The Definition Of A "New Hospital" Is Unambiguous And That Each Hospital Undisputedly Is A "Hospital" That Operated For Less Than Two Years During The Cost Reporting Periods At Issue.**

Two Board members dissented from majority's interpretation of 42 C.F.R. § 412.300(b).  The dissenters determined that "[t]he regulation is clear on its face and therefore, dispositive."  JA___ (*Bloomington* AR 22-24); JA___ (*Augusta* AR 24-26).  Specifically:

> The [Hospitals] are new hospitals separate and distinct from the host hospitals, none of the exceptions to the definition of "new hospital" apply to the [Hospitals] and none of the [Hospitals] previously operated.  The Providers therefore qualify as new hospitals under 42 C.F.R. § 412.300(b).

JA___ (*Bloomington* AR 22); JA___ (*Augusta* AR 24).  The dissenters also noted that the majority's focus on the capital assets acquired by new entrants was not

---

[8]     As explained *infra*, pp. 50-59, the Board's presumption in this regard simply was false.  *None* of the capital-related costs for which the Hospitals are seeking reimbursement previously had ever been claimed by any other hospital. *Bloomington* AR 200-50; *Augusta* AR 115-64.

consistent with the use of the term "hospital" in the Medicare statute itself as referring to an institution that is a  provider of services:

> 42 U.S.C. § 1395ww is titled "Payments to hospitals for inpatient hospital services."  Clearly the payment is made to the entity or provider.

*Id*.  The dissenters also criticized the majority for relying on the supposed "intent" of the regulation, noting that the meaning the majority ascribed to the regulation is not found anywhere in the statute, the Secretary's regulations, or the legislative or regulatory history.  JA___ (*Bloomington* AR 23); JA___ (*Augusta* AR 25).

And, lastly, the dissenters took issue with the purported "principle" embraced by the majority that the "new hospital" exemption "should be limited to assets for which the Medicare program has not previously made payment under the reasonable cost principles."  The dissenters bluntly noted:  "In our opinion, based on the language of the statute and regulation, *there is absolutely nothing that supports this principle*."  JA___ (*Bloomington* AR 22); JA___ (*Augusta* AR 24) (emphasis added).

### D.    After The Secretary Declines To Review The Board's Decisions, The Hospitals Sue In District Court.

In a timely fashion, the Hospitals asked the Administrator of CMS to review and reverse the *Bloomington* and *Augusta* decisions.  *See* JA___ (*Bloomington* AR 3-5); JA___ (*Augusta* AR 4-6); *see also* 42 U.S.C. § 1395oo(f)(1) (a Board decision is final unless the Secretary reverses, affirms or modifies the Board's

decision on her own motion); 42 C.F.R. § 405.1875(a)(1) (delegating to the
Administrator the authority to review a Board decision).  The Administrator
declined to review the decisions.  JA___ (*Bloomington* AR 1-2); JA___ (*Augusta*
AR 1-2).

    The Hospitals then filed complaints in the district court, seeking review of
the Board's decisions under 42 U.S.C. § 1395oo(f).  JA___ (*Bloomington* DE 1);
JA____ (*Augusta* DE 1).  The actions were consolidated for purposes of motions
and briefing.  JA____ (*Bloomington* DE 15; *Augusta* DE 17).    In a memorandum
opinion issued March 31, 2011, the district court denied the Hospitals' motion for
summary judgment, and granted the Secretary's cross-motion in part.  JA____
(*Bloomington* DE 24 (memorandum opinion), 25 (order)).  The district court
agreed with the Secretary that:  (1)  the definition of "hospital" in 42 C.F.R.
§ 412.300(b) is ambiguous; (2) the Board's interpretation of that ambiguous term is
entitled to substantial deference; and (3) it is reasonable to interpret that term to
exclude hospitals that lease and renovate space that previously had been used by
another "provider" for more than two years.  JA___ (*Bloomington* DE 24).

The district court also believed it reasonable for the Board to construe 42 C.F.R. § 412.300(b) to avoid the risk that the Medicare program will make multiple reimbursements for the same capital assets. *Id.*[9]

With respect to Victoria and Select-South Dallas, the district court noted that another hospital had operated on those Hospitals' chosen sites of operations for more than two years, but that the other hospital did not operate on the site during the two years immediately before Victoria and Select-South Dallas commenced operations. *Id.* The district court remanded the *Bloomington* case to the Secretary for clarification as to whether those two Hospitals qualified as "new hospitals" under the Secretary's construction of 42 C.F.R. § 412.300(b). JA____ (*Bloomington* DE 25 (order), 29 (order)).

On remand, the Secretary's delegate (the Administrator of CMS) determined that 42 C.F.R. § 412.300(b) does not require that the "two years of operation" immediately precede the cost reporting period at issue and that Select-South Dallas and Victoria do not qualify as "new hospitals" because another hospital had operated from their chosen sites of operations for more than two years. JA___.

---

[9]    Again, however, the focus on tracing the history of assets (and not provider institutions) and the focus on the potential for the Medicare program to pay multiple times for the costs the same assets is perplexing. There is no dispute that the Hospitals are brand new institutions and entitled to be reimbursed for all of the capital-related expenditures they have claimed in this case; only the rate of reimbursement is in dispute.

(*Bloomington* SAR 1445-51).  The district court subsequently granted summary

judgment for the Secretary on this issue, and entered a final decision.  JA____

(*Bloomington* DE 48; *Augusta* DE 53).

## SUMMARY OF ARGUMENT

Each Hospital that filed a cost report for a period that began on or after

October 1, 2002, should have been treated as a "new hospital" eligible for

reimbursement of 85% of its actual, reasonable capital-related costs.  Each one of

those Hospitals indisputably meets the definition of a "new hospital" provided in

42 C.F.R. § 412.300(b) and is entitled to reimbursement at the 85% rate under the

"new hospital" exemption because each was "a hospital that has operated (under

previous or present ownership) for less than 2 years" during its respective cost

reporting period.  The parties have stipulated that each of those Hospitals was a

"hospital" as the Medicare statute defines that term.  They also have stipulated that

none of those Hospitals operated in any capacity prior to the cost reporting periods

at issue.  Rather, each Hospital indisputably was established by Select as a new

institution, went through a capital-intensive start-up process just before the cost

reporting periods at issue, and commenced operations during the cost reporting

periods at issue.

Despite undisputed evidence that each Hospital had operated for less than

two years, a three-member majority of the Board erroneously determined that the

Hospitals should not be treated as "new hospitals" simply because they leased space in a building that previously had been used by another, unrelated hospital for more than two years. That conclusion was arbitrary and capricious, unreasonable, and contrary to the law.

The Board started from a fatally flawed premise—that the regulation is ambiguous—and, from there, used flawed reasoning to reach a demonstrably incorrect, highly idiosyncratic result. The Board's rulings cannot be squared with: the definition of a "hospital" under 42 U.S.C. § 1395x(e); the scheme the Medicare statute establishes for the reimbursement of hospitals and other providers of services; the Secretary's other regulations; or the Secretary's stated intent when she adopted the definition of a "new hospital" and made the "new hospital' exemption a permanent feature of the inpatient prospective payment system.

Furthermore, the Board's rulings are expressly premised on a *presumption* about one of the Hospitals' capital assets (their leases to occupy their chosen sites of operations) that not only is unsupported by substantial evidence but is demonstrably wrong. Because the Board's decisions were arbitrary, capricious, unreasonable, and contrary to law and unsupported by substantial evidence, this Court should reverse and direct the district court to enter summary judgment in favor of each Hospital that filed a cost report for a period that began on or after October 1, 2002.

- 34 -

## ARGUMENT

### I.     The Standard And Scope Of Review

This Court reviews an order granting summary judgment *de novo*, using the same standard as the district court.  *Tenet HealthSystems HealthCorp. v. Thompson,* 254 F.3d 238, 243-44 (D.C. Cir. 2001); *Pharmaceutical Research and Manufacturers of America v. Thompson*, 362 F.3d. 817, 821 (D.C. Cir. 2004).

Judicial review of a final decision by the Board is governed by the Administrative Procedure Act.  42 U.S.C. § 1395oo(f)(1) (citing 5 U.S.C. ch. 7). Under the Administrative Procedure Act, the Court must set aside an agency decision that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Court also must set the agency's decision aside if it is "unsupported by substantial evidence."  5 U.S.C. § 706(2)(E).

In cases like this one, where an agency has interpreted its own regulation, the Court must review the regulation *de novo* and make an independent decision about whether it is ambiguous.  If the regulation is unambiguous, the Court must apply the unambiguous meaning and may not entertain any agency construction that differs from that meaning.  *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000) (affording no deference to an agency interpretation of an unambiguous regulation); *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (affording no deference

to an agency interpretation of a rule that simply paraphrased the terms of a federal statute); *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992) ("a court should be guided by an administrative construction of a regulation only 'if the meaning of the words used is in doubt'") (quoting *Pfizer, Inc. v. Heckler*, 735 F.2d 1502, 1509 (D.C. Cir. 1984)); *id.* ("Deference to agency interpretations [of a regulation] is not in order if the rule's meaning is clear on its face.").  Indeed, deference to an agency position taken in the face of an unambiguous regulation would allow the agency to create a new regulation *de facto* under the guise of interpretation.  *Christensen*, 529 U.S. at 588. That is something an agency cannot do.  *Id.*

Furthermore, even when a regulation is ambiguous, the Court has a duty to review the agency's construction and reverse if the agency's interpretation is plainly erroneous or inconsistent with the regulation.  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  Simply put, the agency's interpretation of a regulation cannot be affirmed if "an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'"  *Id.; Dantran, Inc. v. Dep't of Labor*, 171 F.3d 58, 65 (1st Cir. 1999) (refusing to sustain an interpretation that "has no plausible link to the goals of the regulatory scheme and would lead to absurd results").

Finally, the Court may consider only the reasons the agency gave for its decision in the underlying administrative proceedings and may not consider *post hoc* rationalizations by government counsel. *See, e.g., Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action, [because *SEC v. Chenery Corp.*, 332 U.S. 194 (1947)] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself"); *Chamber of Commerce of the United States v. Securities Exch. Comm'n*, 412 F.3d 133, 143-44 (D.C. Cir. 2005) (same); *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 348 n. 12, 351 n. 18 (D.C. Cir. 1987) ("the [Board] did not itself rely on this factor so it cannot properly be urged in support of the [Board's] decision").

## II. The Board's Decisions Are Arbitrary, Capricious, Unreasonable, And Contrary To Law.

The Hospitals are "new hospitals" entitled to reimbursement of 85% of their capital-related costs for cost reporting periods beginning on or after October 1, 2002. The meaning of the term "hospital," as used in 42 C.F.R. § 412.300(b) is not ambiguous; rather, it should be given its ordinary meaning as used in the Medicare statute. Each of the Hospitals indisputably satisfies that definition. In the alternative, even if the term were ambiguous, the Board's construction of it is arbitrary, capricious, and unreasonable.

### A.   The Definition Of A "New Hospital" In 42 C.F.R. § 412.300(b) Is Not Ambiguous.

#### 1.   Congress Established The Meaning Of "Hospital" In The Medicare Statute.

The Board held that (1) the definition of a "new hospital" in 42 C.F.R. § 412.300(b) is ambiguous in its use of the term "hospital." JA___(*Bloomington* AR 16); JA___ (*Augusta* AR 19).  The Board further held that the term "hospital" reasonably should be construed to require an analysis of an institution's assets, and that it is proper to exclude an institution that has operated for less than two years but leases a site of operations previously used by another hospital.  The Board's construction of the term "hospital" flies in the face of well-established principles of interpretation and is untenable.  The regulation is not ambiguous in its use of the term "hospital." To the contrary, the term "hospital" has a clear meaning provided by Congress—a meaning the Board ignored and that each of the Hospitals indisputably satisfies.  As a result, this Court owes no deference to the Board's idiosyncratic construction of the term "hospital" or its construction of 42 C.F.R. § 412.300(b).

It is well-established that a regulation that is clear and unambiguous must be enforced by its terms.  *Lamie v. United States,* 540 U.S. 526, 534 (2004) ("when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its

terms"); *Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) (the rules of statutory construction apply when interpreting a regulation); *Ashtabula County Med. Center v. Thompson*, 352 F.3d 1090, 1094 (6th Cir. 2003) (deference to the Secretary's interpretation of a regulation "only comes into play if its plain language is ambiguous").  And, a regulation is ambiguous only if it can reasonably be interpreted multiple ways, giving rise to multiple conclusions.  *United States v. Levin*, 496 F.Supp.2d 116, 120 (D.D.C. 2007).

Where, as here, a term is defined by statute, it is presumed to have the same meaning in the regulations that implement that statute.  *Sorenson v. Sec'y of the Treasury*, 475 U.S. 851, 860 (1986); *NRDC v. EPA*, 489 F.3d 1250, 1257-60 (D.C. Cir. 2007); *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932).  Only where the text of a statute or regulation expressly indicates that a different meaning applies will the presumption of uniform meaning be overcome.  *Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1436-37 (D.C. Cir. 1996).

Here, neither the Medicare statute nor 42 C.F.R. § 412.300(b) states, or even suggests, that the noun "hospital" as used in the regulation means anything other than the meaning Congress gave it in 42 U.S.C. § 1395x(e).  To the contrary, when Congress directed the Secretary to create the capital prospective payment system and exceptions thereto, Congress used the statutory term "hospital."  42 U.S.C. § 1395ww(a)(2) (directing the Secretary to create exceptions based on the "special

needs of . . . new *hospitals* . . . and of *hospitals* which provide atypical services.

. . . and to take into account extraordinary circumstances beyond the *hospital's*

control") (emphasis added).

It is presumed that a regulator acts with knowledge of what the statute says

and with the aim of complying with the statute and Congress's express delegation

of authority. *Sorenson*, 475 U.S. at 860 (quoting *Helvering v. Stockholms Enskilda*

*Bank*, 293 U.S. 84, 87 (1934*)); see also Gustafson v. Alloyd Co*., 513 U.S. 561, 570

(1995). Thus, if the Secretary had intended to use the term "hospital" in 42 C.F.R

§ 412.300(b) in a sense that differed from the meaning chosen by Congress, the

Secretary was required to state in the regulation itself that some other definition of

"hospital" would apply. *Weaver*, 87 F.3d at 1436-37. Yet, here, the language,

structure, and history of § 412.300(b) all establish that the Secretary used the term

"hospital" in its ordinary, statutory sense. *See infra*, pp. 43-56.

Because the Secretary failed to state that the defined term "hospital" was

being used in a manner different than the manner established by Congress, the

Board was required to consider and apply the statutory definition of a "hospital"

when construing 42 C.F.R. § 412.300(b). In short, as the dissenters aptly pointed

out: "[i]n the context of the statute and regulations, the word 'hospital' [in

§ 412.300(b)]" "is *not* ambiguous and is consistent with the underlying statute."

- 40 -

JA___ (*Bloomington* AR 21-22 (emphasis in original)); JA___ (*Augusta* AR 23-24).

Although the Hospitals repeatedly called the Board's attention to the statutory definition of "hospital[,]" the Board completely ignored that definition in the *Bloomington* and *Augusta* decisions. Instead, the Board simply asserted that § 412.300(b) was ambiguous in its use of the term "hospital" and proceeded to develop a new construction of the word "hospital" from whole cloth. This improper approach compels reversal. *See Ashtabula*, 352 F.3d at 1097 (because the word "provider" as used in a regulation has a plain meaning, the court rejects the Secretary's construction of it); *Maryland General Hospital, Inc. v. Thompson*, 308 F.3d 340, 347 (4th Cir. 2002) (same).

> **2.** **When The Term "Hospital" Is Given The Meaning Established By Congress, It Is Clear That Appellants Are "New Hospitals" Entitled To Reimbursement Of 85% Of Their Actual Capital-Related Costs For Cost Reporting Periods Beginning On Or After October 1, 2002.**

Once the Board's legal error is recognized and the term "hospital" is given the meaning established by Congress in 42 U.S.C. § 1395x(e), the record requires that the Court reverse the district court's judgment and direct the entry of summary judgment in favor of each Hospital that filed a cost report for a period that began on or after October 1, 2002.

As explained *supra*, a "hospital" is defined in the Medicare statute as an institution that, *inter alia*, provides certain services, maintains certain corporate and organizational records, has plans and processes, has a budget, and meets certain licensing requirements.  42 U.S.C. § 1395x(e).  There is no dispute that, for each of the Hospitals that filed a cost report for a period that began on or after October 1, 2002, each Hospital was a "hospital[,]" as the Medicare statute defines that term, during the cost reporting periods at issue.  It is equally undisputed that those Hospitals did not operate in *any* capacity before the cost reporting periods at issue.  JA____ (*Bloomington* AR 781, ¶¶ 4, 5); JA____ (*Augusta* AR 230, ¶¶ 5, 6).  Each Hospital:  (1) was established by Select as a new institution; (2) went through a capital-intensive start-up process just before the cost reporting periods at issue to acquire all the assets, staff, and approvals needed to commence operations; and (3) commenced operations during the cost reporting periods at issue.  JA____ (*Bloomington* AR 301-02; *Augusta* AR 186-87).

Lastly, as the entire Board recognized, none of the Hospitals is described by any of the subparts to 42 C.F.R. § 412.300(b)(1)-(4), which provide that a "new hospital is not" an existing hospital that experiences a change in institutional management or ownership or a significant change in its historic asset base.  JA____ (*Bloomington* AR 16-17, 22); JA____ (*Augusta* AR 19, 24).

Nothing more is required to qualify as a "new hospital" under 42 C.F.R. § 412.300(b); as the dissent correctly noted: "[b]ased on the statute and the regulation, the [Hospitals] are entitled to the exemption for new hospitals for cost reports beginning on or after October 1, 2002." JA____ (*Bloomington* AR 24); JA____ (*Augusta* AR 26). Accordingly, this Court should reverse and should direct the district court to enter summary judgment in favor of each Hospital that filed a cost report for a period that began on or after October 1, 2002.

### B. Even If The Definition Of A "New Hospital" Were Ambiguous In Its Use Of The Term "Hospital," The Board's Construction Of "Hospital" Is Plainly Erroneous And Inconsistent With The Statutory And Regulatory Scheme.

In the alternative, even if this Court were to conclude that 42 C.F.R. § 412.300(b) is ambiguous in its use of the term "hospital" and that the Board's construction of "hospital" therefore is eligible for some degree of deference, the Court nevertheless should conclude that the Board's construction of the term "hospital" is plainly erroneous and inconsistent with the statutory and regulatory scheme. *Thomas Jefferson Univ.,* 512 U.S. at 512.

An agency's construction of a regulation cannot be affirmed if "an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation'." *Id.; see Emery Mining Co. v. Secretary of Labor*, 744 F.2d 1411, 1414 (10th Cir. 1984) ("[courts] must construe [a regulation] in light of the statute [it] implements,

keeping in mind that where there is an interpretation of an ambiguous regulation which is reasonable and consistent with the statute, that interpretation is to be preferred").

Any reasonable construction of the term "hospital" as it appears in 42 C.F.R. § 412.300(b) must cover institutions, like the Hospitals, that did not have a historic asset base prior to entering the field of inpatient hospital services, that went through a capital-intensive start-up process just before the cost reporting periods at issue to acquire the assets they needed to commence operations, and that faced potential low occupancy and low Medicare utilization in their first months of operations. The Board's construction, by contrast, takes a fundamentally different approach whereby the status of a new entrant depends on the tracing of the assets that it acquires to become operational. That approach is not reasonable because it is not consistent with Congress's or the Secretary's intent in defining the term "new hospital" or in providing new hospitals with an exemption from the inpatient prospective payment system.

### 1. The Board's Decisions Were Not Informed By The Medicare Statute's Definition Of A "Hospital."

*Remarkably, the Board's decisions make no mention of the statutory definition of "hospital."* Instead, the Board struck out on its own, cobbling together an altogether new approach to defining a "hospital" that involves scrutinizing the source of a particular asset acquired as part of a new entrant's

start-up efforts. This approach to deciding what qualifies as a "hospital" has no support in the Medicare statute.

The Board's radical departure from the statutory definition of "hospital" in favor of an idiosyncratic definition of the Board's own creation is itself sufficient to render the Board's decisions arbitrary and capricious and compel reversal. *Ashtabula County Medical Center v. Thompson,* 191 F.Supp.2d 884, 893-94 (N.D. Ohio 2002) (even assuming the term "new provider" and "provider" are ambiguous, the Secretary's interpretation of a regulation as excluding a class of providers that purchased certificate of need rights from another, unrelated provider that has existed for more than three years is arbitrary, capricious, and clearly erroneous), *aff'd*, 352 F.3d 1090 (6th Cir. 2003); *Maryland General Hospital*, 308 F.3d at 344-45 (the meaning of "provider" in a regulatory definition for "new providers" had to be construed in light of the Medicare statute); *Rowan Cos. v. United States*, 452 U.S. 247, 253 (1981) (a regulatory definition cannot conflict with a statutory definition), *abrogated on other grounds by statute.*

> **2.    The Board's Construction Of The Term "Hospital" Is Not Consistent With The Use Of The Term Throughout 42 C.F.R. § 412.300(b).**

The Board's construction of the term "hospital" also cannot be reconciled with the use of the term "hospital" in context and throughout 42 C.F.R. § 412.300(b). To begin, the first sentence of § 412.300(b) states that a "new

hospital" is a "hospital *that has operated* (under previous or present ownership) for less than 2 years." (emphasis added). The meaning of that first sentence could not be clearer: it defines a "new hospital" as an *institution* that *operates* over a period of time. It uses the term "hospital" to describe the legal entity that "operates," not any asset (or collection of assets) that may "be operated." Furthermore, that first sentence makes clear that the "newness" of the hospital depends on the length of time the entity "has operated (under previous or present ownership)," *not* on the provenance of any assets that the entity may have acquired in order to operate and provide inpatient hospital services.

If the Secretary had intended to make the newness of a hospital depend on whether the hospital acquired some or all of its assets from, or is located on premises previously occupied by, some other, unaffiliated hospital, the Secretary could have written a regulation that accomplished that result. Yet that is not what the first sentence of § 412.300(b) provides.

The four subparts to § 412.300(b) likewise belie the Board's construction of the regulation. The Secretary added those four subparts to the regulation in 1992 to make clear that a "new hospital" is *not* an *existing* hospital that merely undergoes a change in institutional management or ownership, assets, or Medicare status. 57 Fed. Reg. at 39790, 39804. Indeed, each subpart uses the term

"hospital" in a manner that is *consistent* with 42 U.S.C. § 1395x(e)—*i.e.*, to refer to an existing provider of services that meets the statutory requirements. *Id.*

For example, the first subpart states that a new hospital is not "[a] hospital that builds new or replacement facilities at the same or another location even if coincidental with a change of ownership, a change in management, or a lease arrangement." 42 C.F.R. § 412.300(b)(1). The use of the term "hospital" in that subpart is clear and unambiguous: the "hospital" is the legal entity or institution that decides whether to build new or replacement "facilities" at a particular "location," whereas the "facilities" are the assets the hospital builds or replaces. Subpart (1) does not support the Board's conclusion that the regulation can be construed to exclude from the definition of "new hospital" an altogether new institution that leases space previously used by another, unaffiliated hospital.

The second, third, and fourth subparts also use the term "hospital" unambiguously to refer to an existing institution. Subparts (2), (3), and (4) state, respectively, that a new hospital is not a "hospital" that: "closes and subsequently reopens[;]" "has been in operation for more than 2 years but has participated in the Medicare program for less than 2 years[;]" or "changes its status from a hospital that is excluded from the prospective payment systems to a hospital that is subject to the capital prospective payment systems." 42 C.F.R. § 412.300(b)(2), (3), (4). Only legal entities and institutions can close and open for business, participate in

Medicare, and be subject to (or excluded from) Medicare's prospective payment systems.  An asset or collection of assets cannot.

Thus, none of the subparts supports the Board's position that "hospital" is an ambiguous term in § 412.300(b) or its position that § 412.300(b) was promulgated to exclude a new entrant into the field of hospital services based on the source of the assets it acquires to begin operating and providing services..  To the contrary, the complete text of § 412.300(b) is consistent with the Secretary's stated objective of shielding new entrants into the field of inpatient hospital services from the inpatient prospective payment system, while also making it clear that the "new hospital" exemption does not apply to existing providers who simply undergo a change in management, assets, or Medicare status.

> **3.** **The Board's Idiosyncratic Construction Of The Term "Hospital" Also Is Irreconcilable With The Secretary's Use Of The Terms "Hospital" And "New Hospital" In Other Regulations, Including Companion Regulations.**

In addition to being inconsistent with the Medicare statute and the rest of § 412.300(b), the idiosyncratic meaning the Board gave the term "hospital" also is glaringly inconsistent with the Secretary's use of that term elsewhere.  As explained *supra*, pp. 11-14, when the Secretary promulgated the various regulations establishing the inpatient prospective payment system, and defined when and to whom the new rules would apply, the Secretary never expressed a different or special meaning for the term "hospital."  Similarly, 42 C.F.R.

- 48 -

§ 412.304(c)(2) makes clear that the final regulations apply to "new hospitals" with "cost reporting periods" beginning on or after October 1, 2002. That regulation is sensible only if a "hospital" (and thus a "new hospital") is understood to be the institution that acquires assets, provides services to Medicare inpatients, and seeks reimbursement for operating and capital-related costs associated with those services. For example, the *institution* known as Select Specialty Hospital-Baton Rouge, Inc. has cost reporting periods; the leased space in which Select Specialty Hospital-Baton Rouge, Inc. operates does not.

Moreover, prior to adopting the inpatient prospective payment system, the Secretary had promulgated many other regulations that apply to "hospitals," including the procedures whereby a "hospital" can be certified under the Medicare program. *See, e.g.*, 42 C.F.R. Part 482 (setting for the conditions of participation for "hospitals"). Under those regulations, too, the term "hospital" has its ordinary, statutory meaning as an "institution" that is a "provider of services." Those regulations are devoid of the notion (adopted by the Board here) that a "hospital" is defined by reference to where and from whom the institution leases its physical space or acquires any other of its assets.

- 49 -

### 4. The Board's Reliance On The Purported Purpose Of The "New Hospital" Exemption Also Was Arbitrary And Capricious.

The Board also purported to rest its construction of 42 C.F.R. § 412.300(b) on the Secretary's purpose and intent in defining the term "new hospital" and giving them an exemption from the inpatient prospective payment system. However, the majority fundamentally misapprehended the Secretary's stated purpose and intent, which was to provide favorable reimbursement treatment to new entrants. Specifically, in 1991 and 1992, when the Secretary first promulgated an exemption for new hospitals, the Secretary made it clear that the "basic premises of" the "new hospital" exemption set forth in § 412.300(b) were to benefit "new entrants" that do not have a "historic asset base" prior to entering the "field" of hospital services, that have "incurred start-up costs to become operational[,]" and that "need to build a relationship with the community" (57 Fed. Reg. at 39790, 39804), but *not* to benefit existing hospitals that merely undergo a change in their institutional management or ownership, asset base, or Medicare status. *Id.* Here, the Hospitals indisputably are new entrants into the field of inpatient hospital services in their respective communities; moreover, as long-term care hospitals, they entered the field to provide new, specialized services not previously provided by existing institutions. They incurred substantial start-up costs to begin operating, including lease expenses recognized as bona fide capital

costs under Medicare.  And they faced the same issues of underutilization and lack of community relationships as any new entrant.

The Board majority, however, relied heavily on a passage from the final rulemaking release for the new hospital exemption, which provides that:

> This payment provision was implemented to provide special protection to new hospitals during the transition period in response to concerns that prospective payments . . . may not be adequate initially to cover the capital costs of *newly built* hospitals.

JA____ (*Bloomington* AR 16-17); JA____ (*Augusta* AR 19) (citing 67 Fed. Reg. at 50101) (emphasis supplied by the Board).  From there, the majority concluded that it was the Secretary's intent to afford the "new hospital" exemption only to hospitals that are "newly built," *e.g.*, built from the ground up.  The majority buttressed that conclusion with the "principle" that the "new hospital" exemption "should be limited only to assets for which the Medicare program has not previously made payment under the reasonable cost principles." JA____ (*Bloomington* AR 16-17); JA____ (*Augusta* AR 19).

The Board's conclusion that the phrase "newly built" means that only institutions that build new facilities with new bricks and mortar are entitled to the "new hospital" exemption is untethered to either the congressional mandate or the Secretary's intent in promulgating 42 C.F.R . § 412.300(b).  Nothing in Congress's direction to the Secretary or the Secretary's own rulemaking statements distinguishes between new entrants that build facilities from the ground up and

- 51 -

new entrants (like the Hospitals) that lease and renovate space in an existing building.  To the contrary, as the Secretary stated elsewhere, all of the regulations concerning the capital prospective payment system (including the new hospital exemption) "*must be neutral with respect to decisions concerning whether to renovate or replace existing assets.*"  *Id.* (emphasis added).  In short, the Board's approach fundamentally loses sight of, and sharply skews, the intent behind 42 C.F.R. § 412.300(b).

It was arbitrary and capricious for the Board to inject into its analysis of the term "hospital" a purported policy consideration, namely, the "principle" that "new hospital" status should depend on whether an undisputedly new provider of services acquires its asserts from another provider that itself previously claimed reimbursements from the Medicare program under the reasonable cost approach. That "principle" is not codified in any statute or regulation, and the Board cites no place where either Congress or the Secretary stated that "principle" as the purpose (or even *a* purpose) of the regulation.

In any event, even if this *were* what the Secretary intended to accomplish (there is no indication that it is), it is well-established that "regulations cannot be construed to mean what an agency intended but did not adequately express." *Kent Nowlin Const. Co. v. Occupational Safety and Health Review Com'n*, 593 F.2d 368, 371 (10th Cir. 1979); *Diamond Roofing v. OSHRC*, 528 F.2d 645, 649 (5th

Cir. 1976); *L.R. Willson & Sons, Inc. v. Donovan*, 685 F.2d 664, 675 (D.C. Cir. 1982); *Duchek v. Nat'l Transp. Safety Board*, 364 F.3d 311, 318 (D.C. Cir. 2004) (setting aside FAA interpretation of the "spirit" of regulations as arbitrary and capricious where inconsistent with their purpose); *Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F.Supp.2d 28, 33-36 (D.D.C. 2003) (striking an interpretive rule that added an additional requirement to an established substantive rule).

To the contrary, as the dissenters aptly pointed out, the purported regulatory "principle" that guided the majority's analysis is cut from whole cloth:

> [T]he majority accepts the principle expressed by the Intermediary that, "the exemption to receive cost reimbursement for the capital-related costs should be limited only to assets for which the Medicare program has not previously made payment under the reasonable cost principles." In our opinion, based on the language of the statute and regulation, *there is absolutely nothing that supports this principle.*

JA____ (*Bloomington* AR 22); JA____ (*Augusta* AR 24).

The polestar of the Board's efforts to construe the regulation—its purported concern with duplicative reimbursement by the Medicare program—also is nonsensical, for several different reasons.

*First,* the Board's factual presumption that some other hospital claimed reimbursement under the reasonable cost approach for the "original costs" it incurred constructing an existing building is wholly unsupported by the record.

*Second*, even if the record could support the assumption that the Medicare program previously reimbursed some other hospital for the "original costs" *it*

incurred constructing a building, such capital costs are analytically distinct from the capital costs a tenant hospital incurs when it leases a building or space in a building.  42 C.F.R. § 413.130.[10]  Reimbursing two different hospitals for two different capital costs incurred at very different points in time is not reasonably described as the making of "duplicative" payments.

And, *third*, the approach the Board adopted will not achieve its professed goal of preventing duplicative payments by the Medicare program, because the Board does not dispute that each of the Hospitals is entitled to recover its lease expenses (and all of its other claimed expenses as well); the dispute is about the *reimbursement rate* only.

In sum, by adopting a reading of 42 C.F.R. § 412.300(b) that does not appear in any other regulation, cannot be squared with companion regulations, and does not advance the Secretary's stated intent in promulgating the regulation, the Board acted arbitrarily, capriciously, and contrary to law.

---

[10]    The Secretary's regulations expressly recognize that lease expenses are capital-related costs that a hospital may submit for reimbursement.  42 C.F.R. § 413.130.  Significantly, that regulation does not state that a hospital is entitled to be reimbursed for its lease expenses if and only if the lessor is an entity other than another hospital.  For all intents and purposes, however, the Board improperly has read such a qualification into the regulations.

5.    **The Board's Decisions Produce Inefficient Results, Purport To Advance A Policy Goal Not Mandated By Congress Or The Secretary, And Improperly Deny "New Hospital" Status To All HIH Providers.**

Lastly, the Board's idiosyncratic construction of 42 C.F.R. § 412.300(b) produces inefficient results and purports to advance policy goals of the Board's own creation that have no mandate from Congress or the Secretary. *First*, the Board's idiosyncratic construction of the regulation as requiring the decisionmaker to determine the identity of the new entrant's landlord, or to look historically at whether other, unaffiliated institutions once operated on the same premises, is inconsistent with Congress's mandate to create exceptions for "hospitals" with "special needs." Rather than provide financial support for "hospitals" with special needs, including new entrants into the medical field like the Hospitals here, the Board implemented an idiosyncratic construction of the regulation that it believes will save the Medicare program money by limiting new providers' rights to be reimbursed at the 85% rate if the provider happens to lease its physical space from, or happens to operate on premises once occupied by, some other, unaffiliated institution that also has participated in Medicare.

*Second*, the Board's decisions produce inefficient results and will skew new entrants' decisionmaking in undesirable and inefficient ways. On the Board's reading of the regulation, a small, 30-bed hospital that has operated for less than two years would not qualify as a "new hospital" if it leases and renovates space

that previously was used by another, unrelated hospital in the 1980s and 1990s but has been vacant for decades.  On the other hand, the same hospital would qualify as a "new hospital" if it spends more money to lease a green field and build a building from the ground-up.  Such a result paradoxically reduces a new entrant's incentives to spend its capital efficiently when entering a market, and creates a danger that Medicare will pay more for capital costs as entrants tailor their asset acquisition decisions to meet the Board's construction of the definition of a "new hospital."  That result is not consistent with the Secretary's stated intent that the inpatient prospective payment system create "neutral incentives" with respect to hospitals' decisions to incur capital-related costs.  57 Fed. Reg. at 39790, 39804.

*Third*, and relatedly, the Board's idiosyncratic reading of the regulation effectively guarantees that no HIH provider—which, by its very definition occupies space in a building or on a campus that also is used by another hospital— will *ever* be entitled to reimbursement at the 85% rate.  This result, too, is untethered to the statutory scheme.  Neither Congress nor the Secretary expressed any intent to exclude this entire category of hospitals from treatment as "new hospitals," and it was arbitrary, capricious, and unreasonable for the Board to create such a result.

**III.   Even If The Board's Construction Of The Regulation Could Be Credited, Reversal Nevertheless Is Compelled Because The Board's Rulings Are Not Supported By Substantial Evidence.**

Finally, the Board's rulings are based on express presumptions about the nature and costs of the certain capital assets—*i.e.*, the Hospitals' leases—that are not only unsupported by substantial evidence but demonstrably wrong.

For purposes of the Administrative Procedure Act, "[s]ubstantial evidence," is the amount of evidence constituting "'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn . . . is one of fact for the jury.'" *Kay v. F.C.C.*, 396 F.3d 1184, 1188 (D.C. Cir. 2005) (citing *Illinois Cent. R.R. v. Norfolk & W. Ry.*, 385 U.S. 57, 66 (1966)).  In applying the substantial evidence standard, a court is "obliged to search the entire record, or those parts to which the parties refer [it], to determine whether on the basis of all the testimony and exhibits before the agency it could fairly and reasonably find the facts as it did." *Braniff Airways, Inc. v. C. A. B.*, 379 F.2d 453, 462-463 (D.C. Cir. 1967) (citations omitted). A court must decide whether there is competent evidence, when viewed in light of contrary evidence that may also appear, which supports the findings upon which the agency has predicated its conclusions.  *See id.*  "None of these salutary principles of judicial restraint requires the court to accept meekly 'administrative pronouncements clearly at variance with established facts.'" *Id.*

- 57 -

As explained *supra*, the Board predicated its decisions on its self-styled factual presumption that some other hospitals already had claimed and received reimbursement at the reasonable cost rate for capital-related costs that the Hospitals are seeking.  That presumption finds no support in the record and is categorically untrue.  JA____ (*Bloomington* AR 16-17); JA____ (*Augusta* AR 19) An agency's decision cannot rest on this type of hypothesis.  *Braniff Airways,* 379 F.2d at 462-63.

The Board also fundamentally misapprehended the nature of the capital-related costs the Hospitals are claiming.  None of the Hospitals were claiming, for example, the right to be reimbursed for the "original costs"—presumably incurred by others years or decades earlier—of construction of the physical buildings in which they are leasing space.  To the contrary, the Hospitals are seeking for reimbursement for the significant capital costs *they themselves incurred* when they demolished the leased premises, extensively renovated and re-built the space, and incurred capital lease expenses.  42 C.F.R. § 413.130.  Significantly, neither the intermediary nor the Board questioned the bona fides of any of the capital-related costs for which the Hospitals are seeking reimbursement.  And, as discussed *supra*, it is legally irrelevant that the Hospital is making those lease payments to some other, unaffiliated hospital (as opposed to, for example, to the owner of an office building) pursuant to an arms-length lease agreement.  In short,  -the Board's

presumption that any of the costs for which the Hospitals are seeking

reimbursement previously had been sought by and/or paid to, some other hospital,

lacks sufficient evidence in the record.  The Board's decisions should be reversed

for this reason as well.

## CONCLUSION

For all of the foregoing reasons, the Board's construction of 42 C.F.R.

§ 412.300(b) is unreasonable, arbitrary, capricious, and not in accordance with the

law.  This Court should (1) reverse the district court's judgment, (2) direct the

district court to enter summary judgment in favor of each Hospital that filed a cost

report for a period that began on or after October 1, 2002, and (3) grant the other

and further relief (including prejudgment interest and costs) these Hospitals seek in

the Complaints For Review Of Agency Action.

March 28, 2013                              Respectfully submitted,

                                            */s/ David J. Bird*
                                            _____

Andrew C. Bernasconi                        David J. Bird
Daniel Z. Herbst                            Donna M. Doblick
REED SMITH LLP                              REED SMITH LLP
1301 K Street, NW                           225 Fifth Avenue
Suite 1100 – East Tower                     Pittsburgh, PA 15222
Washington, DC 20005                        Tel: 412.288.3131
Tel:  202.414.9200                          Fax: 412.288.3063
Fax: 202.414.9299                           dbird@reedsmith.com
abernasconi@reedsmith.com                   ddoblick@reedsmith.com
dherbst@reedsmith.com

*Counsel for Appellants In Nos. 12-5355 & 12-5358*

- 59 -

**ADDENDUM**

## 42 U.S.C. § 1395x(e) – Hospital

The term "hospital" . . .  means an institution which—

(1) is primarily engaged in providing, by or under the supervision of physicians, to inpatients (A) diagnostic services and therapeutic services for medical diagnosis, treatment, and care of injured, disabled, or sick persons, or (B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons;

(2) maintains clinical records on all patients;

(3) has bylaws in effect with respect to its staff of physicians;

(4) has a requirement that every patient with respect to whom payment may be made under this subchapter must be under the care of a physician, except that a patient receiving qualified psychologist services (as defined in subsection (ii) of this section) may be under the care of a clinical psychologist with respect to such services to the extent permitted under State law;

(5) provides 24-hour nursing service rendered or supervised by a registered professional nurse, and has a licensed practical nurse or registered professional nurse on duty at all times; except that until January 1, 1979, the Secretary is authorized to waive the requirement of this paragraph for any one-year period with respect to any institution, insofar as such requirement relates to the provision of twenty-four-hour nursing service rendered or supervised by a registered professional nurse (except that in any event a registered professional nurse must be present on the premises to render or supervise the nursing service provided, during at least the regular daytime shift), where immediately preceding such one-year period he finds that—

> (A) such institution is located in a rural area and the supply of hospital services in such area is not sufficient to meet the needs of individuals residing therein,

> (B) the failure of such institution to qualify as a hospital would seriously reduce the availability of such services to such individuals, and

- ADD1 -

(C) such institution has made and continues to make a good faith effort to comply with this paragraph, but such compliance is impeded by the lack of qualified nursing personnel in such area;

(6)(A) has in effect a hospital utilization review plan which meets the requirements of subsection (k) of this section and (B) that meets the requirements of subsection (ee) of this section;

(7) in the case of an institution in any State in which State or applicable local law provides for the licensing of hospitals, (A) is licensed pursuant to such law or (B) is approved, by the agency of such State or locality responsible for licensing hospitals, as meeting the standards established for such licensing;

(8) has in effect an overall plan and budget that meets the requirements of subsection (z) of this section; and

(9) meets such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals who are furnished services in the institution.

For purposes of subsection (a)(2) of this section, such term includes any institution which meets the requirements of paragraph (1) of this subsection. For purposes of sections 1395f(d) and 1395n(b) of this title (including determination of whether an individual received inpatient hospital services or diagnostic services for purposes of such sections), section 1395f(f)(2) of this title, and subsection (i) of this section, such term includes any institution which (i) meets the requirements of paragraphs (5) and (7) of this subsection, (ii) is not primarily engaged in providing the services described in subsection (j)(1)(A) of this section and (iii) is primarily engaged in providing, by or under the supervision of individuals referred to in paragraph (1) of subsection (r) of this section, to inpatients diagnostic services and therapeutic services for medical diagnosis, treatment, and care of injured, disabled, or sick persons, or rehabilitation services for the rehabilitation of injured, disabled, or sick persons. For purposes of section 1395f(f)(1) of this title, such term includes an institution which (i) is a hospital for purposes of sections 1395f(d), 1395f(f)(2), and 1395n(b) of this title and (ii) is accredited by a national accreditation body recognized by the Secretary under section 1395bb(a) of this title, or is accredited by or approved by a program of the country in which such institution is located if the Secretary finds the accreditation or comparable approval standards of such program to be essentially equivalent to those of such a national accreditation

body..[1] Notwithstanding the preceding provisions of this subsection, such term shall not, except for purposes of subsection (a)(2) of this section, include any institution which is primarily for the care and treatment of mental diseases unless it is a psychiatric hospital (as defined in subsection (f) of this section). The term "hospital" also includes a religious nonmedical health care institution (as defined in subsection (ss)(1) of this section), but only with respect to items and services ordinarily furnished by such institution to inpatients, and payment may be made with respect to services provided by or in such an institution only to such extent and under such conditions, limitations, and requirements (in addition to or in lieu of the conditions, limitations, and requirements otherwise applicable) as may be provided in regulations consistent with section 1395i–5 of this title. For provisions deeming certain requirements of this subsection to be met in the case of accredited institutions, see section 1395bb of this title. The term "hospital" also includes a facility of fifty beds or less which is located in an area determined by the Secretary to meet the definition relating to a rural area described in subparagraph (A) of paragraph (5) of this subsection and which meets the other requirements of this subsection, except that—

> (A)with respect to the requirements for nursing services applicable after December 31, 1978, such requirements shall provide for temporary waiver of the requirements, for such period as the Secretary deems appropriate, where (i) the facility's failure to fully comply with the requirements is attributable to a temporary shortage of qualified nursing personnel in the area in which the facility is located, (ii) a registered professional nurse is present on the premises to render or supervise the nursing service provided during at least the regular daytime shift, and (iii) the Secretary determines that the employment of such nursing personnel as are available to the facility during such temporary period will not adversely affect the health and safety of patients;

> (B)with respect to the health and safety requirements promulgated under paragraph (9), such requirements shall be applied by the Secretary to a facility herein defined in such manner as to assure that personnel requirements take into account the availability of technical personnel and the educational opportunities for technical personnel in the area in which such facility is located, and the scope of services rendered by such facility; and the Secretary, by regulations, shall provide for the continued participation of such a facility where such personnel requirements are not fully met, for such period as the Secretary determines that (i) the facility is making good faith efforts to fully comply with the personnel requirements, (ii) the employment

- ADD3 -

by the facility of such personnel as are available to the facility will not adversely affect the health and safety of patients, and (iii) if the Secretary has determined that because of the facility's waiver under this subparagraph the facility should limit its scope of services in order not to adversely affect the health and safety of the facility's patients, the facility is so limiting the scope of services it provides; and

(C) with respect to the fire and safety requirements promulgated under paragraph (9), the Secretary (i) may waive, for such period as he deems appropriate, specific provisions of such requirements which if rigidly applied would result in unreasonable hardship for such a facility and which, if not applied, would not jeopardize the health and safety of patients, and (ii) may accept a facility's compliance with all applicable State codes relating to fire and safety in lieu of compliance with the fire and safety requirements promulgated under paragraph (9), if he determines that such State has in effect fire and safety codes, imposed by State law, which adequately protect patients.

The term "hospital" does not include, unless the context otherwise requires, a critical access hospital (as defined in subsection (mm)(1) of this section).

## 42 U.S.C. § 1395x(u) – Provider of services

The term "provider of services" means a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program, or, for purposes of section 1395f(g) and section 1395n(e), of this title, a fund.

## 42 U.S.C. § 1395 x(ccc) – Long-term care hospital

The term "long-term care hospital" means a hospital which:

> (1) is primarily engaged in providing inpatient services, by or under the supervision of a physician, to Medicare beneficiaries whose medically complex conditions require a long hospital stay and programs of care provided by a long-term care hospital;

> (2) has an average inpatient length of stay (as determined by the Secretary) of greater than 25 days, or meets the requirements of clause (II) of section 1395ww(d)(1)(B)(iv) of this title;

> (3) satisfies the requirements of subsection (e) of this section; and

> (4) meets the following facility criteria:

>> (A) the institution has a patient review process, documented in the patient medical record, that screens patients prior to admission for appropriateness of admission to a long-term care hospital, validates within 48 hours of admission that patients meet admission criteria for long-term care hospitals, regularly evaluates patients throughout their stay for continuation of care in a long-term care hospital, and assesses the available discharge options when patients no longer meet such continued stay criteria;

>> (B) the institution has active physician involvement with patients during their treatment through an organized medical staff, physician-directed treatment with physician on-site availability on a daily basis to review patient progress, and consulting physicians on call and capable of being at the patient's side within a moderate period of time, as determined by the Secretary; and

>> (C) the institution has interdisciplinary team treatment for patients, requiring interdisciplinary teams of health care professionals, including physicians, to prepare and carry out an individualized treatment plan for each patient.

## 42 C.F.R. § 412.300 – Scope of subpart and definition

(a) Purpose. This subpart implements section 1886(g)(1)(A) of the Act by establishing a prospective payment system for inpatient hospital capital-related costs. Under this system, payment is made on the basis described in § 412.304 through § 412.374 for inpatient hospital capital-related costs furnished by hospitals subject to the prospective payment system under subpart B of this part.

(b) Definition. For purposes of this subpart, a new hospital means a hospital that has operated (under previous or present ownership) for less than 2 years. The following hospitals are not new hospitals:

> (1) A hospital that builds new or replacement facilities at the same or another location even if coincidental with a change of ownership, a change in management, or a lease arrangement.

> (2) A hospital that closes and subsequently reopens.

> (3) A hospital that has been in operation for more than 2 years but has participated in the Medicare program for less than 2 years.

> (4) A hospital that changes its status from a hospital that is excluded from the prospective payment systems to a hospital that is subject to the capital prospective payment systems.

## 42 C.F.R. § 412.304 – Implementation of the capital prospective payment system

(a) General rule. As described in §§ 412.312 through 412.370, effective with cost reporting periods beginning on or after October 1, 1991, CMS pays an amount determined under the capital prospective payment system for each inpatient hospital discharge as defined in § 412.4. This amount is in addition to the amount payable under the prospective payment system for inpatient hospital operating costs as determined under subpart D of this part.

(b) Cost reporting periods beginning on or after October 1, 1991 and before October 1, 2001. For cost reporting periods beginning on or after October 1, 1991

and before October 1, 2001, the capital payment amount is based on either a combination of payments for old capital costs and new capital costs or a fully prospective rate, as determined under § 412.324 through § 412.348.

(c) Cost reporting periods beginning on or after October 1, 2001.--

(1) General. Except as provided in paragraph (c)(2) of this section, for cost reporting periods beginning on or after October 1, 2001, the capital payment amount is based solely on the Federal rate determined under §§ 412.308(a) and (b) and updated under § 412.308(c).

(2) Payment to new hospitals. For cost reporting periods beginning on or after October 1, 2002--

(i) A new hospital, as defined under § 412.300(b), is paid 85 percent of its allowable Medicare inpatient hospital capital-related costs through its cost report ending at least 2 years after the hospital accepts its first patient, unless the new hospital elects to be paid under the capital prospective payment system based on 100 percent of the Federal rate.

(A) If the new hospital elects to be paid based on 100 percent of the Federal rate, the new hospital must submit a written request to the fiscal intermediary by the later of December 1, 2002 or 60 days before the beginning of its cost reporting period.

(B) Once a new hospital elects to be paid based on 100 percent of the Federal rate, it may not revert to payment at 85 percent of its allowable Medicare inpatient hospital capital-related costs.

(ii) For the third year and subsequent years, the hospital is paid based on the Federal rate as described under § 412.312.

(d) Interim payments. Interim payments are made to the hospital as provided in § 412.116.

## 42 C.F.R. § 412.324 – General description

(a) Hospitals under Medicare in FY 1991. During the ten-year transition period, payments to a hospital with a hospital-specific rate below the Federal rate are based on the fully prospective payment methodology under § 412.340 or for a hospital with a hospital-specific rate above the Federal rate, the hold-harmless payment methodology under § 412.344.

(b) New hospitals.

> (1) A new hospital, as defined under § 412.300(b), is paid 85 percent of its allowable Medicare inpatient hospital capital-related costs through its cost reporting period ending at least 2 years after the hospital accepts its first patient.

> (2) For the third year through the remainder of the transition period, the hospital is paid based on the fully prospective payment methodology or the hold-harmless payment methodology using the base period determined under § 412.328(a)(2).

> (3) If the hospital is paid under the hold-harmless methodology described in § 412.344, the hold-harmless payment for old capital costs described in § 412.344(a)(1) is payable for up to and including 8 years and may continue beyond the first cost reporting period beginning on or after October 1, 2000.

(c) Hospitals with 52–53 week fiscal years ending September 25 through September 29. For purposes of this subpart, a hospital with a 52–53 week fiscal year period beginning September 26 through September 30, 1992 is deemed to have the same beginning date for all cost reporting periods beginning before October 1, 2000 (unless the hospital later changes its cost reporting period).

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(c) of the Federal Rules of Appellate Procedure, I certify that:

1.     This brief complies with the type-volume limitation of Rule 32(a)(7)(b) because this brief contains 13,792 words, excluding the parts of the brief exempted by Rule 32(a)(7)(b)(iii), as counted by Microsoft Word 2010, the word processing software used to prepare this brief.

2.     This brief complies with the typeface requirements of Rule 32(a)(5) and the type size requirements of Rule 32(a)(6) because this brief has been prepared in 14 pt. Times New Roman, a proportionally spaced roman typeface, using Microsoft Word 2010, the word processing software used to prepare this brief.

March 28, 2013                                    Respectfully submitted,

                                                  */s/ David J. Bird*

                                                  _____

                                                  David J. Bird
                                                  REED SMITH LLP
                                                  225 Fifth Avenue
                                                  Pittsburgh, PA 15222
                                                  Tel: 412.288.3131
                                                  Fax: 412.288.3063
                                                  dbird@reedsmith.com

                                                  *Counsel for Appellants In Nos. 12-5355*
                                                  *& 12-5358*

## CERTIFICATE OF SERVICE

I certify that, on this day, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  I further certify that that I have served the printed copies of the foregoing by third-party courier for overnight delivery to the following counsel:

>Joshua Paul Waldman
>    202-514-0236
>    Joshua.Waldman@usdoj.gov
>Michael S. Raab
>    202-514-4053
>    michael.raab@usdoj.gov
>U.S. Department of Justice (DOJ)
>Civil Division, Appellate Staff
>Room 7232
>950 Pennsylvania Avenue, NW
>Washington, DC 20530-0001
>202-514-2000
>202-514-9405 (fax)

March 28, 2013                    Respectfully submitted,

                                 */s/ David J. Bird*

                                 ――――――――――――――――――

                                 David J. Bird
                                 REED SMITH LLP
                                 225 Fifth Avenue
                                 Pittsburgh, PA 15222
                                 Tel: 412.288.3131
                                 Fax: 412.288.3063
                                 dbird@reedsmith.com

                                 *Counsel for Appellants In Nos. 12-5355
                                 & 12-5358*